IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

| | | |
|---|---|---|
| | ) | CRIMINAL. NO. 9:23 cr 396 |
| | ) | |
| **UNITED STATES OF AMERICA** | ) | 18 U.S.C. § 2 |
| | ) | 18 U.S.C. § 1343 |
| | ) | 18 U.S.C. § 1344 |
| | ) | 18 U.S.C. § 1349 |
| **vs.** | ) | 18 U.S.C. § 1956 |
| | ) | 18 U.S.C. § 981(a)(1)(A) |
| | ) | 18 U.S.C. § 981(a)(1)(C) |
| **RICHARD ALEXANDER MURDAUGH** | ) | 18 U.S.C. § 982(a)(1) |
| | ) | 18 U.S.C. § 982(a)(2) |
| | ) | 28 U.S.C. § 2461(c) |
| | ) | |
| | ) | **SEALED INDICTMENT** |

**THE GRAND JURY CHARGES THAT:**

**RECEIVED**

At all times relevant to this Indictment:

MAY 2 3 2023

Background on the Scheme to Defraud through Palmetto State Bank FLORENCE, S.C.

1.     The Defendant, RICHARD ALEXANDER MURDAUGH, was a personal injury

attorney with the "Law Firm," located in Hampton, South Carolina. As a personal injury attorney,

RICHARD ALEXANDER MURDAUGH represented individuals in civil claims following injury,

death, and other loss.

2.     Palmetto State Bank ("PSB"), headquartered in Hampton, South Carolina, is a

financial institution, as defined by Title 18, United States Code, Section 20, with deposits insured

by the Federal Deposit Insurance Corporation ("FDIC").

3.     Russell Lucius Laffitte[1] began working at PSB in 1997. He served as a bank teller

---

[1] Russell Lucius Laffitte was convicted of multiple related charges in November 2022 and is
awaiting sentencing.

and loan officer until he became the Executive Vice President and Chief Operating Officer in 2015. In 2020, Russell Lucius Laffitte became the Chief Executive Officer of PSB. Russell Lucius Laffitte also served on PSB's Executive Committee, responsible for reviewing and approving large loan applications, as well as on its Board of Directors. In early 2022, PSB terminated Russell Lucius Laffitte's employment. At all times relevant to this Indictment, Russell Lucius Laffitte served as an officer, director, agent, or employee of an FDIC-insured financial institution, as defined under Title 18. As both a director and an executive officer, Russell Lucius Laffitte was responsible for managing PSB's Hampton Branch, including its day-to-day operations, and keeping members of PSB's Executive Committee and Board of Directors informed about PSB's financial condition.

4.     RICHARD ALEXANDER MURDAUGH, the Law Firm, and the Law Firm's other law partners maintained bank accounts at PSB and were long-time clients of the bank.

5.     Given RICHARD ALEXANDER MURDAUGH'S long-standing relationship with PSB and Russell Lucius Laffitte's role as manager of the Hampton branch, RICHARD ALEXANDER MURDAUGH and Russell Lucius Laffitte established a close "professional" relationship. Russell Lucius Laffitte served as RICHARD ALEXANDER MURDAUGH'S primary point of contact at PSB. He handled nearly all of RICHARD ALEXANDER MURDAUGH'S banking needs, including negotiating checks and extending loans.

6.     RICHARD ALEXANDER MURDAUGH and the Law Firm asked Russell Lucius Laffitte to serve as personal representative and conservator for various personal injury clients of the Law Firm, including A.P., H.P., N.T., H.P.Y., M.W., and the Estate of D.B.,[2] persons known

---

[2] A.B., a beneficiary of the Estate of D.B. and a person known to the Grand Jury, and the Estate of D.B. both obtained settlements following civil lawsuits. A.B., the Estate of D.B., and/or the

to the Grand Jury, most of whom were RICHARD ALEXANDER MURDAUGH'S clients. Russell Lucius Laffitte served as conservator for A.P., H.P., N.T., H.P.Y., and M.W., persons known to the Grand Jury. Russell Lucius Laffitte also served as personal representative for the Estate of D.B., another person known to the Grand Jury. Russell Lucius Laffitte collected more than $350,000.00 in fees as personal representative and conservator for A.P., H.P., N.T., H.P.Y., and the Estate of D.B., RICHARD ALEXANDER MURDAUGH'S personal injury clients.

The Scheme to Defraud through PSB

7.      The Defendant, RICHARD ALEXANDER MURDAUGH, and his coconspirator, Russell Lucius Laffitte, knowingly and intentionally devised a scheme and artifice to obtain money and property from RICHARD ALEXANDER MURDAUGH'S personal injury clients.

8.      From in or around July 2011 through a date unknown to the Grand Jury, but up to at least October 2021, in the District of South Carolina, the Defendant, RICHARD ALEXANDER MURDAUGH, and his coconspirator, Russell Lucius Laffitte, knowingly and intentionally combined, conspired, confederated, agreed and had tacit understanding with others, both known and unknown, and engaged in a scheme, plan, and artifice to defraud and to obtain money and property from RICHARD ALEXANDER MURDAUGH'S personal injury clients, by means of materially false and fraudulent pretenses, representations, and promises, by making false and misleading statements, and omitting facts necessary to make the statements truthful and not misleading.

9.      The Defendant, RICHARD ALEXANDER MURDAUGH, or members of the conspiracy, by means of false and fraudulent pretenses, made materially false and misleading

Estate's beneficiaries will be referred to collectively as the "Estate of D.B." throughout this Indictment.

statements and representations and did omit material information in an effort to obtain money and property from RICHARD ALEXANDER MURDAUGH'S personal injury clients and the Law Firm, money which was owed by and in the care, custody, and control of PSB.

10.     As part of the scheme, and in an effort to hide the source and destination of the settlement funds, RICHARD ALEXANDER MURDAUGH directed Law Firm employees to make settlement checks payable to "Palmetto State Bank." RICHARD ALEXANDER MURDAUGH then delivered, or caused to be delivered, the checks to Russell Lucius Laffitte.

11.     Thereafter, Russell Lucius Laffitte used his position as director and employee of PSB, while serving as the personal representative and conservator for the personal injury clients, to obtain money in the care, custody, and control of the bank, belonging to the personal injury clients. RICHARD ALEXANDER MURDAUGH directed Russell Lucius Laffitte to use the settlement funds for RICHARD ALEXANDER MURDAUGH'S personal benefit, including using the proceeds to pay off personal loans and for personal expenses and cash withdrawals, as further set forth below.

12.     To further the scheme, various members of the conspiracy at various times and places took the following actions:

### H.P. and A.P.

a. RICHARD ALEXANDER MURDAUGH requested that Russell Lucius Laffitte serve as conservator for his personal injury clients, A.P. and H.P., who received funds following settlements of civil lawsuits. As conservator, Russell Lucius Laffitte maintained bank accounts at PSB for the conservatorships. Russell Lucius Laffitte collected approximately $140,441.00 in conservator fees from A.P. and approximately $113,314.00 in conservator fees from H.P.

b. While serving as conservator for H.P., beginning on July 18, 2011, Russell Lucius Laffitte extended ten loans from the conservatorship accounts to himself, totaling $355,000.00. Russell Lucius Laffitte never sought approval from the probate court to extend these loans, he never notified the Law Firm of the loans, and he never notified H.P. of the loans. Russell Lucius Laffitte used his conservatorship and personal representative fees from other personal injury clients to pay off some of the loans. When H.P. turned eighteen years old, Russell Lucius Laffitte had to pay back the entirety of the loans. Russell Lucius Laffitte credited his fees for serving as H.P.'s conservator to reduce the amount owed on the loans. He then received a $245,000.00 private loan from a third party to pay back the loans to H.P. in full. Russell Lucius Laffitte is still paying off the private loan from the third party.

c. While serving as conservator for H.P., Russell Lucius Laffitte extended sixteen unsecured loans to RICHARD ALEXANDER MURDAUGH, totaling $963,500.00, from H.P.'s conservatorship account.

d. Russell Lucius Laffitte extended the first loan to RICHARD ALEXANDER MURDAUGH from H.P.'s conservatorship account on September 14, 2011. At the time, RICHARD ALEXANDER MURDAUGH was overdrawn on his personal checking account at PSB. Russell Lucius Laffitte transferred the loaned funds from H.P.'s conservatorship account into RICHARD ALEXANDER MURDAUGH'S personal checking account to cover the overdraft. Thereafter, Russell Lucius Laffitte continued to extend RICHARD ALEXANDER MURDAUGH hundreds of thousands of dollars in unsecured loans, transferring the loaned funds into RICHARD ALEXANDER MURDAUGH'S personal checking accounts. Russell Lucius Laffitte

often transferred funds from H.P.'s conservatorship account when RICHARD ALEXANDER MURDAUGH was overdrawn on his personal checking accounts, often by tens of thousands of dollars. Russell Lucius Laffitte extended loans to cover RICHARD ALEXANDER MURDAUGH'S overdrawn personal checking accounts.

e.  Russell Lucius Laffitte never sought permission from the probate court to extend these loans and never notified H.P. of the loans. Russell Lucius Laffitte never submitted a Petition for Expenditures or Order Allowing Purchases to the probate court for approval of the loans.

f.  RICHARD ALEXANDER MURDAUGH used funds stolen from other personal injury clients to pay back the loans to H.P. RICHARD ALEXANDER MURDAUGH presented Russell Lucius Laffitte with checks representing funds from the Estate of D.B, N.T., and H.P.Y., persons known to the Grand Jury, disbursed following settlements of civil lawsuits. All of these checks referenced the client on the memo line. Russell Lucius Laffitte negotiated and distributed all of the checks from funds RICHARD ALEXANDER MURDAUGH stole to repay RICHARD ALEXANDER MURDAUGH'S loans from H.P. After RICHARD ALEXANDER MURDAUGH presented the disbursement checks, Russell Lucius Laffitte transferred the funds into H.P.'s conservator account, totaling more than $650,000.00.

g.  When H.P. turned eighteen and RICHARD ALEXANDER MURDAUGH had to pay off the remainder of the loans from H.P.'s conservatorship account, Russell Lucius Laffitte extended a $500,000 line of credit to RICHARD ALEXANDER MURDAUGH, for purposes of "farming." Thereafter, Russell Lucius Laffitte issued a cashier's check from the line of credit totaling $284,787.52, equal to the outstanding

balance owed to H.P. by RICHARD ALEXANDER MURDAUGH. RICHARD ALEXANDER MURDAUGH then used those funds to pay off the remainder of the loan balance.

### A.B. and the Estate of D.B.

h. RICHARD ALEXANDER MURDAUGH requested that Russell Lucius Laffitte serve as personal representative for the Estate of D.B. Russell Lucius Laffitte collected $35,000 for his role as personal representative, although he did not manage any money for the Estate of D.B. and had very limited interaction with the beneficiaries of the Estate.

i. Following the settlement of a civil lawsuit for the Estate of D.B., the Law Firm issued one large check for $1,325,000.00 to PSB to fund a structured settlement. RICHARD ALEXANDER MURDAUGH directed Russell Lucius Laffitte to email him and request that the Law Firm re-cut the check in amounts determined by RICHARD ALEXANDER MURDAUGH. Russell Lucius Laffitte complied with RICHARD ALEXANDER MURDAUGH'S request and sent him a separate email requesting that the disbursement check be re-cut accordingly. RICHARD ALEXANDER MURDAUGH then forwarded Russell Lucius Laffitte's email to the Law Firm's employees, and the check was thereafter divided.

j. Russell Lucius Laffitte then negotiated and distributed the checks at RICHARD ALEXANDER MURDAUGH'S direction and for his personal benefit, including:

   i.   $388,687.50 money order to a third-party individual to repay a private loan;

   ii.  $482,124.35 transfer to H.P.'s account to repay loans Russell Lucius Laffitte extended RICHARD ALEXANDER MURDAUGH as conservator for H.P.;

   iii. $75,000.00 money order to RICHARD ALEXANDER MURDAUGH'S father;

iv.   $7,500.00 money order to RICHARD ALEXANDER MURDAUGH'S wife;

v.    $34,000.00 wire transfer to 4M Iron LLC;

vi.   $8,200.00 money order to another individual associated with RICHARD ALEXANDER MURDAUGH;

vii.  $29,000.00 money order to Honey Creek Motors;

viii. $49,500.00 wire transfer to Southern Crane; and

ix.   $250,988.15 in deposits and transfers into RICHARD ALEXANDER MURDAUGH'S personal checking accounts and cash back.

The memo lines of each check issued from the Law Firm to PSB referenced the Estate of D.B., individuals to whom Russell Lucius Laffitte owed a duty as personal representative for the Estate of D.B.

k.   On October 28, 2021, Russell Lucius Laffitte wrote a check for $680,000.00 to the Law Firm for his role in negotiating the checks from the Estate of D.B. settlement, an amount representing half of the loss sustained by the Estate of D.B. Russell Lucius Laffitte initiated the payment without consultation with, approval from, or notice to the PSB Board of Directors. Russell Lucius Laffitte also concealed his involvement in negotiating the disbursement checks from the Estate of D.B. settlement and distributing them at RICHARD ALEXANDER MURDAUGH'S direction.

M.W.

l.   The Law Firm requested that Russell Lucius Laffitte serve as conservator for M.W., a person known to the Grand Jury. Russell Lucius Laffitte collected a $3,025.96 fee as conservator. Russell Lucius Laffitte extended a $40,000.00 unsecured loan to RICHARD ALEXANDER MURDAUGH from M.W.'s conservatorship account. Russell Lucius Laffitte did not seek permission from the probate court to extend this

loan, nor did he notify M.W. of the loan. Russell Lucius Laffitte never submitted a Petition for Expenditures or Order Allowing Purchases to the probate court for approval of the loan.

m. RICHARD ALEXANDER MURDAUGH used funds stolen from another client to repay M.W. Russell Lucius Laffitte negotiated a bank money order from the client's stolen funds, referencing the client's name, to pay off the loan to M.W.

<u>N.T. and H.P.Y.</u>

n. RICHARD ALEXANDER MURDAUGH requested that Russell Lucius Laffitte serve as conservator for H.P.Y. and N.T. Despite a multi-million-dollar settlement, none of the funds went through the conservatorship accounts, and Russell Lucius Laffitte never managed any money.

o. In his role as conservator for H.P.Y. and N.T., Russell Lucius Laffitte signed disbursement sheets indicating that PSB would receive disbursements in the amount of $309,581.46 and $325,000.00 for the conservatorship accounts of H.P.Y. and N.T., respectively. RICHARD ALEXANDER MURDAUGH directed Law Firm employees to issue the settlement checks made payable to PSB then delivered, or caused to be delivered, the checks to Russell Lucius Laffitte. The checks issued pursuant to the disbursements referenced H.P.Y. and N.T. on the memo lines, individuals to whom Russell Lucius Laffitte owed a duty as their conservator.

p. Upon receipt of the disbursement checks, rather than distributing the funds into H.P.Y. and N.T.'s conservatorship accounts, Russell Lucius Laffitte negotiated and distributed the funds at RICHARD ALEXANDER MURDAUGH'S direction and for RICHARD ALEXANDER MURDAUGH'S personal benefit, as follows:

     i.    $10,000.00 deposit made to RICHARD ALEXANDER MURDAUGH'S wife's account;

     ii.    $9,500.00 money order;

     iii.    $920.29 principal payment to a loan regarding RICHARD ALEXANDER MURDAUGH'S boat;

     iv.    $3,137.30 interest payment of loan for RICHARD ALEXANDER MURDAUGH'S boat;

     v.    $100,000.00 money order to Russell Lucius Laffitte's father to pay off personal loan;

     vi.    $50,135.61 money order to H.P.'s conservatorship account to repay loans Russell Lucius Laffitte extended RICHARD ALEXANDER MURDAUGH as conservator for H.P.;

     vii.    $91,220.57 money order to H.P.'s conservatorship account to repay loans Russell Lucius Laffitte extended RICHARD ALEXANDER MURDAUGH as conservator for H.P.;

     viii.    $329,500.00 money order to RICHARD ALEXANDER MURDAUGH'S father; and

     ix.    $40,167.69 money order to M.W. to repay loans Russell Lucius Laffitte extended RICHARD ALEXANDER MURDAUGH as conservator for M.W.

q. N.T. received additional settlement funds totaling $25,245.08. RICHARD ALEXANDER MURDAUGH presented the additional settlement check to Russell Lucius Laffitte to withdraw cash and Russell Lucius Laffitte structured the transactions below $10,000.00. RICHARD ALEXANDER MURDAUGH directed Russell Lucius Laffitte to negotiate the settlement funds as follows:

     i.    $9,000.00 cashed out by an unknown person;

     ii.    $9,000.00 bank money order cashed by unknown person; and

     iii.    $7,245.08 money order cashed by unknown person.

r. Russell Lucius Laffitte collected a $60,000.00 fee as conservator for H.P.Y. and a

$15,000.00 fee as conservator for N.T. Russell Lucius Laffitte used a portion of his fees to pay off some of the personal loans he extended himself from H.P.'s conservatorship account.

## COUNT 1
### Conspiracy to Commit Wire Fraud and Bank Fraud, 18 U.S.C. § 1349

13.    The allegations contained in paragraphs 1 through 12, including all subparts, are incorporated by reference as if set forth fully herein.

14.    From a time beginning no later than July 2011, and continuing until at least October 2021, in the District of South Carolina, the Defendant, RICHARD ALEXANDER MURDAUGH, and his coconspirator Russell Lucius Laffitte, and others, knowingly and intentionally combined, conspired and agreed to:

a.    knowingly devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, and transmit and cause to be transmitted by means of wire, radio, or television communication in interstate commerce, writings, signals, pictures or sounds for the purpose of executing the scheme and artifice, affecting a financial institution, in violation of Title 18, United States Code, Section 1343; and

b.    knowingly execute and attempt to execute a scheme and artifice to obtain property held by PSB, a financial institution insured by the FDIC, and obtain the moneys, funds, credits, assets, securities, and other property owned by and under the custody and control of PSB, by means of materially false and fraudulent pretenses, representations and promises and failing to disclose material information and fraudulently concealing material information, in violation of Title 18, United States Code, Section 1344(2).

## Object of the Conspiracy

15.    The object of the conspiracy was for the Defendant, RICHARD ALEXANDER MURDAUGH, and his coconspirator Russell Lucius Laffitte to obtain money and property from RICHARD ALEXANDER MURDAUGH'S personal injury clients by means of false and fraudulent pretenses, representations, and promises.

## Overt Acts in Furtherance of Conspiracy

16.    In furtherance of the conspiracy, the Defendant, RICHARD ALEXANDER MURDAUGH, committed the following overt acts in furtherance of the conspiracy:

   a.   On or about December 21, 2011, the Defendant, RICHARD ALEXANDER MURDAUGH, directed Russell Lucius Laffitte to negotiate and distribute, and caused to be negotiated and distributed, checks for $309,581.46 and $325,000.00, knowing that the funds belonged to H.P.Y. and N.T.;

   b.   On or about August 29, 2012, and continuing through September 4, 2012, the Defendant, RICHARD ALEXANDER MURDAUGH, directed Russell Lucius Laffitte to negotiate and distribute, and caused to be negotiated and distributed, a check for $25,245.08, knowing that the funds belonged to N.T.;

   c.   On or about February 8, 2013 and March 5, 2013, the Defendant, RICHARD ALEXANDER MURDAUGH, directed Russell Lucius Laffitte to negotiate and distribute, and caused to be negotiated and distributed, $388,687.50 to repay a private loan to a third-party, knowing that the money belonged to the Estate of D.B. and/or the Estate's beneficiaries;

All in violation of Title 18, United States Code, Section 1349.

## COUNT 2
### Bank Fraud, 18 U.S.C. § 1344(2)

**THE GRAND JURY FURTHER CHARGES THAT:**

17.     The allegations contained in paragraphs 1 through 12, including all subparts, are incorporated by reference as if fully set forth herein.

18.     On or about September 13, 2013, in the District of South Carolina, the Defendant, RICHARD ALEXANDER MURDAUGH, with Russell Lucius Laffitte, knowingly executed and attempted to execute a scheme and artifice to obtain money and funds under the custody and control of PSB, an FDIC-insured financial institution, by means of false and fraudulent pretenses, representations and promises, by negotiating and distributing a check totaling $50,684.75, transferring and causing to be transferred $49,500 to Southern Crane on October 28, 2013 and the remainder in cash back on October 29, 2013, knowing that the funds belonged to the Estate of D.B.;

In violation of Title 18, United States Code, Sections 1344(2) and 2.

## COUNT 3
### Wire Fraud, 18 U.S.C. § 1343

**THE GRAND JURY FURTHER CHARGES THAT:**

19.     The allegations contained in paragraphs 1 through 12, including all subparts, are incorporated by reference as if fully set forth herein.

20.     On or about May 12, 2014, in the District of South Carolina, the Defendant, RICHARD ALEXANDER MURDAUGH, having devised a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire in interstate commerce, writings, signs, and signals, for the purpose of executing such a scheme and artifice, in that he

obtained $50,684.75 from the Law Firm, belonging to the Estate of D.B., and distributed the same into his revolving Bank of America credit account on or about May 13, 2014, affecting a financial institution;

In violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT 4
### Wire Fraud, 18 U.S.C. § 1343

**THE GRAND JURY FURTHER CHARGES THAT:**

21.    The allegations contained in paragraphs 1 through 12, including all subparts, are incorporated by reference as if fully set forth herein.

22.    On or about May 12, 2014, in the District of South Carolina, the Defendant, RICHARD ALEXANDER MURDAUGH, having devised a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire in interstate commerce, writings, signs, and signals, for the purpose of executing such a scheme and artifice, in that he obtained $101,369.49 from the Law Firm, belonging to the Estate of D.B., and distributed the same into his Bank of America revolving credit account on June 25, 2014, affecting a financial institution;

In violation of Title 18, United States Code, Sections 1343 and 2.

## COUNTS 5-7
### Wire Fraud, 18 U.S.C. § 1343

**THE GRAND JURY FURTHER CHARGES THAT**:

23.    The allegations contained in paragraphs 1 through 12 and 29 through 34, including all subparts, are incorporated by reference as if fully set forth herein.

24.    Beginning at a time unknown to the Grand Jury but at least September 2005 and

continuing until at least September 2021, in the District of South Carolina and elsewhere, the Defendant, RICHARD ALEXANDER MURDAUGH, knowingly devised a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, and during such period, knowingly transmitted and caused to be transmitted in interstate commerce, by means of wire communications, certain writings, signs, signals, pictures, and sounds, for the purpose of executing the scheme and artifice to defraud, in violation of Title 18, United States Code, Section 1343.

Manner and Means of the Scheme and Artifice to Defraud

25.     The Defendant, RICHARD ALEXANDER MURDAUGH, and his Law Firm obtained settlement funds following the resolution of his personal injury clients' civil claims. Thereafter, the overall recovery amount was distributed according to disbursement sheets, including to the Law Firm as attorney's fees, to lien holders, and to pay expenses associated with the litigation. Law Firm staff issued checks out of the Law Firm's trust account according to the distributions outlined on the disbursement sheets, at the direction of RICHARD ALEXANDER MURDAUGH.

26.     As part of the scheme, the Defendant, RICHARD ALEXANDER MURDAUGH, by means of false and fraudulent pretenses, representations, and promises, routed and redirected clients' settlement funds so as to enrich himself personally, including by:

        a.  Drafting, or directing Law Firm employees to draft, disbursement sheets to send settlement funds to Bank of America accounts owned and controlled by RICHARD ALEXANDER MURDAUGH without proper disclosure or client or Law Firm approval;

        b.  Claiming funds held in the Law Firm's trust account for purposes of satisfying

liens on clients' settlement funds as attorney's fees and directing the disbursement of said funds for his benefit;

c.  Claiming and collecting attorney's fees on fake or nonexistent annuities;

d.  Creating fraudulent "expenses" that were never incurred on client matters and directing the disbursement of settlement funds to pay the cited costs, including claimed medical expenses, construction expenses, and airline expenses;

e.  Directing other attorneys with whom he was associated on client matters to disburse attorney's fees directly to him rather than appropriately routing any such fees through the Law Firm;

f.  Intercepting insurance proceeds intended for beneficiaries and depositing them directly into his personal account.

27.     For the purposes of executing the scheme and artifice to defraud, the Defendant, RICHARD ALEXANDER MURDAUGH, knowingly transmitted and caused to be transmitted in interstate commerce, by means of wire communications, the following electronic signals:

| Count | Date | Victim | Check Number | Amount |
|-------|------|--------|--------------|--------|
| 5 | December 26, 2018 | A.H. | 55894 | $225,073.46 |
| 6 | April 11, 2019 | B.G. | 56398 | $112,500.00 |
| 7 | December 16, 2020 | J.H. | 3639 | $91,867.50 |

All in violation of Title 18, United States Code, Section 1343.

## COUNTS 8-22

**THE GRAND JURY FURTHER CHARGES**:

At all times relevant to this Indictment:

28.     The allegation contained in paragraph 1 is incorporated by reference as if fully set forth herein.

### Background on the Forge Scheme

29.     Forge Consulting, LLC, is a company which specializes in brokering structured insurance settlements. As a personal injury attorney, the Defendant, RICHARD ALEXANDER MURDAUGH, was familiar with Forge Consulting, LLC, and he utilized their services to manage his clients' structured settlements.

30.     Bank of America is a financial institution, as defined by Title 18, United States Code, Section 20, with deposits insured by the Federal Deposit Insurance Corporation ("FDIC").

31.     On September 22, 2015, RICHARD ALEXANDER MURDAUGH opened a bank account at Bank of America titled "Forge," but the bank account had no legitimate affiliation with Forge Consulting, LLC. RICHARD ALEXANDER MURDAUGH was the only authorized signer on the "fake Forge" account and was listed as the owner of the account on the signature card. RICHARD ALEXANDER MURDAUGH opened the "fake Forge" account as part of a scheme to defraud his clients and his Law Firm by transferring settlement checks directly into the "fake Forge" account, making it appear that the funds were being transferred into legitimate accounts run by Forge Consulting, LLC, as part of a structured settlement.

32.     Beginning in May 2017 and continuing until July 2018, RICHARD ALEXANDER MURDAUGH used the "fake Forge" account to steal thousands of dollars in settlement funds from his personal injury clients. The first "fake Forge" account was force closed in July 2018 after being

overdrawn. After the first "fake Forge" account was force closed, RICHARD ALEXANDER MURDAUGH opened a second "fake Forge" account with Bank of America in August 2018. RICHARD ALEXANDER MURDAUGH was the only authorized signer on the account and was listed as the owner on the signature card. RICHARD ALEXANDER MURDAUGH continued to use the "fake Forge" account to steal millions of dollars from his personal injury clients and others.

33.     From in or around May 2017 through a date unknown to the Grand Jury, but up to at least May 2021, in the District of South Carolina, the Defendant, RICHARD ALEXANDER MURDAUGH, knowingly and intentionally devised a scheme, plan, and artifice to defraud and obtain money from RICHARD ALEXANDER MURDAUGH'S personal injury clients, the Law Firm, and others, through the "fake Forge" accounts by means of materially false and fraudulent pretenses, representations, and promises, by making false and misleading statements, and omitting facts necessary to make the statements truthful and not misleading.

34.     The Defendant, RICHARD ALEXANDER MURDAUGH, by means of false and fraudulent pretenses, made materially false and misleading statements and representations and did omit material information in an effort to obtain money and property from RICHARD ALEXANDER MURDAUGH'S personal injury clients, the Law Firm, and others. As part of the scheme, and in an effort to hide the source and destination of the settlement funds, RICHARD ALEXANDER MURDAUGH directed Law Firm employees and others to make settlement checks payable to "Forge." RICHARD ALEXANDER MURDAUGH then delivered the checks to Bank of America. Thereafter, RICHARD ALEXANDER MURDAUGH made cash withdrawals, transferred the funds to another Bank of America account, paid his credit card, and purchased cashier's checks.

## The Estate of G.S. Scheme

35.    "Attorney 2" is a former personal injury attorney who worked with his law firm in Beaufort, South Carolina (hereinafter "Beaufort Law Firm"). Attorney 2 and RICHARD ALEXANDER MURDAUGH were close friends.

36.    On February 26, 2018, RICHARD ALEXANDER MURDAUGH'S housekeeper, G.S., a person known to the Grand Jury, died following what was reported as a slip and fall down the stairs of a home owned by RICHARD ALEXANDER MURDAUGH, caused by his dogs. RICHARD ALEXANDER MURDAUGH recommended that G.S.'s sons, T.S. and B.H., persons known to the Grand Jury (hereinafter "the Estate of G.S."), hire Attorney 2 to represent them and file a claim against RICHARD ALEXANDER MURDAUGH to collect from his homeowner's insurance policies.

37.    Lloyd's of London ("Lloyd's") and Nautilus Insurance Group ("Nautilus") are both companies that offer property and casualty insurance. RICHARD ALEXANDER MURDAUGH had insurance coverage on his homeowner's policies from Lloyd's and Nautilus.

38.    Based on RICHARD ALEXANDER MURDAUGH'S recommendation and at his direction, the Estate of G.S. retained Attorney 2 to file a claim against RICHARD ALEXANDER MURDAUGH'S homeowner's policies.

39.    From in or around February 2018 through a date unknown to the Grand Jury, but up to at least October 2020, in the District of South Carolina, the Defendant, RICHARD ALEXANDER MURDAUGH, and Attorney 2 knowingly and intentionally combined, conspired, confederated, agreed and had a tacit understanding with others, both known and unknown, and engaged in a scheme, plan, and artifice to defraud the Estate of G.S., Nautilus, and Lloyd's, and to obtain money and property from the Estate of G.S., Nautilus, and Lloyd's, by means of materially

false and fraudulent pretenses, representations, and promises, by making false and misleading statements, and omitting facts necessary to make the statements truthful and not misleading. During such period, in the course of executing the scheme and artifice to defraud and to obtain money and property, the Defendant, RICHARD ALEXANDER MURDAUGH, and Attorney 2 did transmit and cause to be transmitted in interstate commerce, wire communications, including writings, signs, signals, pictures, and sounds, for the purpose of executing the scheme and artifice to defraud, in violation of Title 18, United States Code, Section 1343, as fully set forth in paragraph 55 below.

40.     As part of the scheme, and in an effort to hide the source and destination of the settlement funds, RICHARD ALEXANDER MURDAUGH directed Attorney 2 to make settlement checks payable to "Forge." RICHARD ALEXANDER MURDAUGH then deposited the checks into his "fake Forge" account at Bank of America and thereafter used the funds for his own personal enrichment.

41.     As part of the scheme, in November 2018, RICHARD ALEXANDER MURDAUGH requested that a Vice President at PSB, a person known to the Grand Jury, serve as the personal representative of the Estate of G.S. Thereafter, at RICHARD ALEXANDER MURDAUGH'S direction, G.S.'s son renounced his duties as personal representative of the Estate of G.S. to allow the Vice President of PSB to serve as the personal representative.

42.     On December 4, 2018, Lloyd's settled the claim for $505,000.00. The settlement check was drafted to the personal representative of the Estate of G.S. and the Beaufort Law Firm.

43.     On December 19, 2018, after the Lloyd's settlement and as part of the scheme to defraud, the Vice President at PSB was appointed to serve as the Estate of G.S.'s personal representative. The personal representative endorsed the $505,000 settlement check to the Beaufort

Law Firm, giving Attorney 2 control over the funds.

44.    On January 7, 2019, as part of the scheme, Attorney 2 submitted a fraudulent disbursement sheet to the circuit court outlining the disbursement of the settlement funds. The fraudulent disbursement sheet outlined $11,500.00 in "Prosecution Expenses." However, there were no legitimate prosecution expenses.

45.    On January 7, 2019, at RICHARD ALEXANDER MURDAUGH'S direction, Attorney 2 signed a check for $403,500.00 of settlement funds from the Lloyd's settlement to the "fake Forge" account. RICHARD ALEXANDER MURDAUGH deposited the check into his "fake Forge" account on January 9, 2019.

46.    In March 2019, following a mediation, Nautilus agreed to settle the Estate of G.S.'s claim for $3,800,000.00. On April 18, 2019, Nautilus drafted a $3,800,000.00 check to the personal representative of the Estate of G.S. and the Beaufort Law Firm. The personal representative endorsed the check to the Beaufort Law Firm, giving Attorney 2 control of the funds.

47.    On May 13, 2019, as part of the scheme, Attorney 2 submitted a fraudulent disbursement sheet to the circuit court, attaching it to a Petition for Approval of Settlement. The disbursement sheet did not reflect the accurate distribution of the settlement funds. The disbursement sheet fraudulently outlined the disbursement of $1,435,000.00 in attorney's fees and $2,765,000.00 to the Estate of G.S. However, Attorney 2 collected approximately $672,595.85 in attorney's fees, less than half of the attorney's fees he reported to the circuit court. The remaining amount, itemized as attorney's fees on the disbursement sheet, was later included in a check written to the "fake Forge" account at the Defendant RICHARD ALEXANDER MURDAUGH'S direction.

48.    The May 2013 disbursement sheet further outlined $105,000.00 in "Prosecution

Expenses." However, there were no legitimate prosecution expenses. The Defendant RICHARD ALEXANDER MURDAUGH and Attorney 2 intended to use these funds for their own personal enrichment.

49.     On May 13, 2019, Attorney 2 signed a check from the settlement funds to the "fake Forge" account totaling $2,961,931.95, at RICHARD ALEXANDER MURDAUGH'S direction. RICHARD ALEXANDER MURDAUGH deposited the check into the "fake Forge" account on May 15, 2019.

50.     In October 2020, the parties signed a stipulation of dismissal. On October 6, 2020, Attorney 2, at RICHARD ALEXANDER MURDAUGH'S direction, signed a check totaling $118,000.00 to the "fake Forge" account.

51.     At the Defendant RICHARD ALEXANDER MURDAUGH'S direction, Attorney 2 signed checks totaling $3,483,431.95 to the "fake Forge" account. The Defendant, RICHARD ALEXANDER MURDAUGH, deposited the funds into his "fake Forge" account, knowing that the funds were intended for the benefit of the Estate of G.S. and thereafter used the funds for his personal enrichment. The Estate of G.S. did not receive any of the settlement funds.

### COUNT 8
**Conspiracy to Commit Wire Fraud, 18 U.S.C. § 1349**

52.     The allegations contained in paragraphs 1 and 29 through 51 are incorporated by reference as if set forth fully herein.

53.     From in or around February 2018 through a date unknown to the Grand Jury, but up to at least October 2020, in the District of South Carolina, the Defendant, RICHARD ALEXANDER MURDAUGH, and Attorney 2 knowingly and intentionally combined, conspired, confederated, agreed and had a tacit understanding with others, both known and unknown, and engaged in a scheme, plan, and artifice to defraud the Estate of G.S., Nautilus and Lloyd's, and to

obtain money and property from the Estate of G.S., Nautilus and Lloyd's by means of materially false and fraudulent pretenses, representations, and promises, by making false and misleading statements, and omitting facts necessary to make the statements truthful and not misleading. During such period, in the course of executing the scheme and artifice to defraud and to obtain money and property, the Defendant, RICHARD ALEXANDER MURDAUGH, and Attorney 2 did transmit and cause to be transmitted in interstate commerce, wire communications, including writings, signs, signals, pictures, and sounds, for the purpose of executing the scheme and artifice to defraud, in violation of Title 18, United States Code, Section 1343, as fully set forth in paragraph 55 below.

## Object of the Conspiracy

54.     The object of the conspiracy was for the Defendant, RICHARD ALEXANDER MURDAUGH, and his coconspirator, Attorney 2, to obtain money and property by means of false and fraudulent pretenses, representations, and promises, and to defraud the Estate of G.S., Nautilus and Lloyd's.

## Overt Acts in Furtherance of Conspiracy

55.     In furtherance of the conspiracy, the Defendant, RICHARD ALEXANDER MURDAUGH, and Attorney 2 committed the following overt acts in furtherance of the conspiracy:

    a. On or about January 7, 2019, at the Defendant RICHARD ALEXANDER MURDAUGH'S direction, Attorney 2 signed a check for $403,500.00, funds intended for the benefit of the Estate of G.S., to "Forge," a bank account belonging to the Defendant, RICHARD ALEXANDER MURDAUGH. On or about January 9, 2019, the Defendant, RICHARD ALEXANDER MURDAUGH, deposited the

check for $403,500.00 into his "fake Forge" account at Bank of America.

b. On or about May 13, 2019, at the Defendant RICHARD ALEXANDER MURDAUGH'S direction, Attorney 2 signed a check for $2,961,931.95, funds intended for the benefit of the Estate of G.S., to "Forge," a bank account belonging to the Defendant, RICHARD ALEXANDER MURDAUGH. On or about May 15, 2019, the Defendant, RICHARD ALEXANDER MURDAUGH, deposited the check for $2,961,931.95 into his "fake Forge" account at Bank of America.

c. On or about October 6, 2020, at the Defendant RICHARD ALEXANDER MURDAUGH'S direction, Attorney 2 signed a check for $118,000.00, funds intended for the benefit of the Estate of G.S., to "Forge," a bank account belonging to the Defendant, RICHARD ALEXANDER MURDAUGH. On or about October 6, 2020, the Defendant, RICHARD ALEXANDER MURDAUGH, deposited the check for $118,000, belonging to the Estate of G.S., into his "fake Forge" account at Bank of America;

All in violation of Title 18, United States Code, Section 1349.

## COUNTS 9-22
### Money Laundering, 18 U.S.C. § 1956

**THE GRAND JURY FURTHER CHARGES:**

56.     The allegations contained in paragraphs 1 and 29 through 51, including all subparts, are incorporated by reference as if set forth fully herein.

57.     On or about the dates set forth below, in the District of South Carolina, the Defendant, RICHARD ALEXANDER MURDAUGH, did knowingly and willfully conduct financial transactions affecting interstate commerce as set forth below, each of which involved the proceeds of a specified unlawful activity, to wit: wire fraud in violation of Title 18, United States

Code, Section 1343, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity, and while conducting said financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity:

| Count | Date | Transaction |
|---|---|---|
| 9 | August 31, 2018 | $85,000 deposited into BOA account xx7625 |
| 10 | October 3, 2018 | $65,000 deposited into BOA account xx7625 |
| 11 | October 19, 2018 | $19,500 deposited into BOA account xx7625 |
| 12 | December 26, 2018 | $225,073.46 deposited into BOA account xx7625 |
| 13 | January 9, 2019 | $403,500.00 deposited into BOA account xx7625 |
| 14 | February 27, 2019 | $279,850.65 deposited into BOA account xx7625 |
| 15 | April 11, 2019 | $112,500.00 deposited into BOA account xx7625 |
| 16 | May 15, 2019 | $2,961,931.95 deposited into BOA account xx7625 |
| 17 | February 27, 2020 | $750,000 deposited into BOA account xx7625 |
| 18 | October 6, 2020 | $118,000.00 deposited into BOA account xx7625 |
| 19 | November 30, 2020 | $152,866.00 deposited into BOA account xx7625 |
| 20 | December 16, 2020 | $91,867.50 deposited into BOA account xx7625 |
| 21 | January 29, 2021 | $125,000.00 deposited into BOA account xx7625 |
| 22 | May 12, 2021 | $83,333.33 deposited into BOA account xx7625 |

All in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

**FORFEITURE**

CONSPIRACY/WIRE FRAUD/BANK FRAUD:

Upon conviction for violations of Title 18, United States Code, Sections 1343, 1344, and 1349, as charged in this Indictment, the Defendant, RICHARD ALEXANDER MURDAUGH, shall forfeit to the United States, any property, real or personal, which constitutes, is traceable to, or is derived from proceeds the Defendant obtained directly or indirectly as a result of such offenses.

MONEY LAUNDERING:

Upon conviction for violations of Title 18, United States Code, Section 1956, as charged in this Indictment, the Defendant, RICHARD ALEXANDER MURDAUGH, shall forfeit to the United States any property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956, as charged in the Indictment, or any property traceable to such offenses.

PROPERTY:

Pursuant to Title 18, United States Code, Sections 981(a)(1)(A), 981(a)(1)(C), 982(a)(1), and 982(a)(2), and Title 28, United States Code, Section 2461(c), the property subject to forfeiture includes, but is not limited to, the following:

    (1)    Cash Proceeds/Forfeiture Judgment:

           A sum of money equal to all proceeds the Defendant obtained, directly or indirectly, from the offenses charged in this Indictment, that is, a minimum of approximately $7,641,707.09 in United States currency, and all interest and proceeds traceable thereto, and/or such sum that equals all property derived from or traceable to his violations of 18 U.S.C. §§ 1343, 1344, and 1349.

(2)     Money Laundering/Forfeiture Judgment:

A sum of money equal to all property involved in the money laundering offenses charged in this Indictment, and all interest and proceeds traceable thereto, for which the Defendant is liable as the result of his violations of 18 U.S.C. § 1956.

## SUBSTITUTE ASSETS:

If any of the property described above as being subject to forfeiture, as a result of any act or omission of the Defendant-

A.     Cannot be located upon the exercise of due diligence;
B.     Has been transferred or sold to, or deposited with, a third person;
C.     Has been placed beyond the jurisdiction of the court;
D.     Has been substantially diminished in value; or
E.     Has been commingled with other property which cannot be subdivided without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 982(b)(1), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the Defendant up to the value of the forfeitable property;

Pursuant to Title 18, United States Code, Sections 981(a)(1)(A), 981(a)(1)(C), 982(a)(1), and 982(a)(2), and Title 28, United States Code, Section 2461(c).

A _____ True _____ Bill

███████████████████████████

FOREPERSON

ADAIR F. BOROUGHS
UNITED STATES ATTORNEY

By: _____
Emily Evans Limehouse (Fed. ID #12300)
Kathleen Stoughton (Fed. ID #12161)
Winston D. Holliday, Jr. (Fed. ID #7597)
Assistant United States Attorney
151 Meeting Street, Suite 200
Charleston, SC 29401
Tel.:     (843) 727-4381
Fax:     (843) 727-4443
Email: Emily.Limehouse@usdoj.gov