IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

| | | |
|---|---|---|
| United States of America, | ) | Criminal No.: 9:23-cr-00396-RMG |
| | ) | |
| v. | ) | |
| | ) | |
| Richard Alexander Murdaugh, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### AFFIDAVIT OF JOHN T. LAY, JR. AND PETER M. McCOY

PERSONALLY APPEARED BEFORE ME, the undersigned John T. Lay, Jr. and Peter M. McCoy, each of whom, after being duly sworn, deposes and says:

1. Each of us is above 18 years of age and makes this affidavit upon our individual personal knowledge.

2. In September 2021 facts and allegations of facts concerning Richard Alexander Murdaugh's ("Defendant" or "Murdaugh") extensive fraudulent and other wrongful conduct, both civil and criminal, became public knowledge.

3. On or about September 14, 2021, the State of South Carolina charged Murdaugh with the crimes of falsifying a police report, attempted $10 million insurance fraud, conspiracy to commit insurance fraud, and obtaining property through false pretenses. [*See State of South Carolina v. Richard Alexander Murdaugh*, Case Nos. 2021A2510100204, 2021A2510100206, 2021A2510100207; *see also* arrest warrant No. K235570 in *South Carolina v. Murdaugh*].

4. At Murdaugh's bond hearing related to his arrest on these criminal charges before the South Carolina Court of General Sessions on September 16, 2021, Murdaugh's lawyer Richard Harpootlian publicly stated to the court that Murdaugh was essentially "broke".

1

5.      Murdaugh was imprisoned by the State of South Carolina on September 16, 2021, and has remained imprisoned until the date hereof.

6.      On September 16, 2021, Murdaugh executed a durable power of attorney that purported to appoint his son, Richard Alexander Murdaugh, Jr. ("Buster Murdaugh"), as his attorney-in-fact and to grant him broad powers to "sell, assign, convey, pledge, mortgage and encumber . . . and generally manage, any and all property, both real and personal which [Murdaugh] may own or acquire in the future from any source". [**Exhibit 1** – Murdaugh Power of Attorney, pp. 1 and 3]. This power of attorney was recorded in Hampton County, South Carolina on September 23, 2021. [Id.]

7.      On or about October 14, 2021, Murdaugh was charged by the State of South Carolina with various crimes related to his theft of more than $3.4 million from the Estate of Gloria Satterfield. [*See State of South Carolina v. Richard Alexander Murdaugh*, Case Nos. 2021-GS-47-30].

8.      During September and October 2021, Murdaugh and/or his agents and representatives, began transferring his assets and taking other actions in furtherance of selling Murdaugh's real and personal property to third persons and canceling debts owed to him by others. For example, on September 23, 2021, Murdaugh, by and through Buster Murdaugh as his attorney-in-fact, executed a satisfaction of a mortgage with a face value of $970,3541.00 on a 42 acre property located in Hampton and Colleton Counties in favor of his friend J.M. Boulware. In addition, on October 1, 2021, Murdaugh sold his stock in Green Swamp Club, a 7,000 acre hunting club. Murdaugh also listed his Grady White 306 boat for sale for $115,000. Further, Murdaugh transferred his beneficial interest in other real property to a friend and former law partner vis-a-vs a "deed in lieu of foreclosure". Additionally, as of October 22, 2021, Murdaugh owed back taxes

on a home he owned jointly with his deceased wife in Edisto Beach in Colleton County, South Carolina, and such home was set to be auctioned if such local taxes were not paid by December 10, 2021.

9. In light of Murdaugh's pattern and practice of deceitful and fraudulent conduct and the substantial evidence of dissipation and wasting of Murdaugh's known assets that was publicly known at that time, on October 22, 2021 the plaintiff in the lawsuit captioned *Renee S. Beach Personal Representative for the Estate of Mallory Beach, v. Richard Alexander Murdaugh et al.*, Civil Action No. 2019-CP-25-00111 (the "Beach Lawsuit") filed a motion for a temporary injunction prohibiting Murdaugh and anyone acting on his behalf from hiding, concealing, misappropriating, selling, encumbering, transferring, impairing the value of or otherwise disposing of assets Murdaugh had a beneficial interest in ("Subject Assets") and for the establishment of a receivership and appointment of us as co-receivers over Murdaugh's assets.

10. Following submission of written memoranda in support of the motion for temporary injunction and implementation of the receivership and in opposition by Murdaugh, a public hearing was held before the Honorable Daniel D. Hall of the South Carolina Court of Common Pleas, Fourteenth Judicial Circuit (the "South Carolina Circuit Court" or the "Receivership Court") on October 29, 2021.

11. The attorneys for the other victims of the February 2019 boat crash, as well as counsel for the Gloria Satterfield family, were all in support of the efforts to seek a temporary injunction, implementation of the Receivership, and appointment of the Co-Receivers because it would place creditors and claimants on equal footing with respect to executing on any judgment against or debts owed by Murdaugh irrespective of the variable amount of time it may take each claimant to obtain a judgment.

12.     On November 2, 2021, Judge Hall granted the motion through a Form 4 Order, thereby instituting the temporary injunction and establishing the state receivership with respect to the Subject Assets (the "Receivership"). [**Exhibit 2** – 11/2/2021 Form 4].

13.     On November 4, 2021, Judge Hall entered an Order further defining the Co-Receivers' scope of authority as officers of the South Carolina Circuit Court with respect to Murdaugh's assets and the receivership (together with the 11/2/2021 Order, the "Receivership Order). [**Exhibit 3** – 11/4/2021 Order].

14.     The Receivership Order states the South Carolina Circuit Court granted the Co-Receivers broad rights, power, and authority granted by the Receivership Order include "exclusive power and authority: (i) to investigate, identify and attempt to locate all of the Subject Assets[1]; (ii) to collect, marshal and administer all of the Subject Assets; (iii) to accept service on behalf of Alex Murdaugh . . . with respect to [the Subject Assets] . . . ; (iv) to engage counsel on behalf of [Murdaugh] . . . ; and (v) to take any and all steps necessary to identify, recover, protect, collect, preserve, receive, manage, liquidate, sell, administer and marshal, and to do all things incidental, necessary and/or appropriate thereto, all of the Subject Assets during the pendency and final resolution of [the Beach] lawsuit." [Id. at p. 3]. The Receivership Order states further that the South Carolina Circuit Court's "granting of rights, power and authority . . . is intended to be as broad as possible for the Co-Receivers to manage and decide all matters related in any way to the Subject

---

[1] At the time the Receivership Order was entered, the term "Subject Assets" included assets of both Murdaugh and his son, Richard Alexander Murdaugh, Jr. ("Buster Murdaugh"), who purported to hold his father's power of attorney at the time and, upon information and belief at that time, was an intended transferee of Murdaugh's assets in an attempt to place them beyond the reach of the victims of Defendant's various wrongful conduct. Ultimately, the receivership over Buster Murdaugh's assets was terminated following the settlement of various claims against him and against the Estate of Margaret Branstetter Murdaugh. Therefore, the term "Subject Assets" as used in this Affidavit and in the Receivership Order no longer includes Buster Murdaugh's assets.

4

Assets, to the express exclusion of any other person(s), except as expressly retained by [the South Carolina Circuit Court] herein or that the Court is otherwise required to retain under applicable rules or law." [Id.]. The goals of our involvement are to ensure transparency, do our part to restore confidence in the judicial system, ensure assets are protected and, while not picking winners and losers, make sure creditors and victims stand shoulder to shoulder so that no one unfairly gets ahead of anyone else in collection of monies.

15.     To that end, from November 2, 2021 to present the Co-Receivers and our counsel have undertaken extensive efforts to locate, secure, and marshal $2,428,981.29 in liquidated assets and estimated values of unliquidated assets as detailed in the attached accounting. [**Exhibit 4 – Co-Receivers' Accounting**]. Our investigation revealed Murdaugh had a complicated network of financial, property, and business interests which required extensive and legally complex actions by us and our counsel, to include the following:

   a. Canvasing of local, regional, and national financial institutions and insurance companies Murdaugh through the issuance of 50 subpoenas to identify bank accounts, credit cards, and insurance policies and analyzed records produced by such entities.

   b. Issuance of more than 25 subpoenas to various law firms, businesses, and professional and business associates, for records and information regarding their respective relationships and transactions with Murdaugh.

   c. Review and analyze subpoenaed records from a 10-year period to: (i) identify Murdaugh's assets and liabilities; (ii) identify third parties potentially in possession of Murdaugh's assets; and (iii) determine whether there were third parties who may share civil liability for Murdaugh's financial misconduct and other wrongdoing.

d. Conduct searches of public records to identify real property and personal property in which Murdaugh had a beneficial interest and related entities, liens, and mortgages associated therewith.

e. Monitor public dockets for filing of claims against and confessions of judgment by Murdaugh.

f. Hire appraisers and engage brokers for the listing and sale of real property and personal property at fair market value.

g. Secure an agreement from a former law partner that he would not seek to enforce the confession of judgment for $90,000 he obtained from Murdaugh after the public hearing on the motion for a temporary injunction and establishment of the receivership on October 29, 2021 but before the South Carolina Circuit Court's entry of the Receivership Order ahead of other creditors and claimants and would, instead, submit to the jurisdiction of the Receivership Court for an equitable allocation from the Receivership's fund.

h. Challenge the validity of the confession of judgment obtained by another of Murdaugh's former law partners for $477,000 due to the timing of its execution and Murdaugh's attorney's assistance in effectuating such execution despite his knowledge of the South Carolina Circuit Court's decision to grant the temporary injunction and receivership. More specifically, Murdaugh's attorney Jim Griffin agreed on November 1, 2021 to assist in getting that law partner's confession of judgment executed by Murdaugh on November 2 despite express knowledge that the South Carolina Circuit Court notified Mr. Griffin of its decision on November 1, 2021 to grant the injunction. Indeed, on November 2, 2021 Attorney Griffin delivered the law partner's confession

of judgment to Murdaugh in jail on November 2, 2021 for Murdaugh to execute despite Attorney Griffin's knowledge of the court's decision and despite entry of the Form 4 Order at 10:18 am on November 2, 2021. Attorney Griffin's office e-mailed the confession of judgment as executed by Murdaugh to his former law partner on November 2, 2021 at 2:15 pm. The confession of judgment was then filed in the case of Civil Action No. 2021-CP-25-00358 at 3:39 pm on November 2. [**Exhibit 5** – Griffin E-mails].

i. Mr. Lay testified at a criminal bond hearing at Dick Harpootlian's request and pursuant to subpoena regarding the Co-Receivers' investigation into Murdaugh's assets.

j. Engaged a broker, negotiated sales agreement, and completed sale of 146 acres in Berkeley County, South Carolina owned by Redbeard, LLC and 0 United Drive, LLC of which Murdaugh held an ownership interest alongside one or more third parties at a price that substantially exceeded the price provided in a prior sales contract that Murdaugh's family was proceeding towards entering into at the time the Co-Receivers were appointed. This sale resulted in proceeds of $521,549.60, net of fees and expenses related to such transaction, for the Receivership fund.

k. Prepared and filed answers on behalf of Murdaugh to various civil complaints in order to prevent Murdaugh from giving preference to certain victims by defaulting while Murdaugh and his counsel vigorously defended him against claims brought by other victims.

l. Deposed Russell Laffitte on February 24, 2022 to discover information pertaining to his association with Murdaugh, Murdaugh's bank accounts at and mortgages and loans

from Palmetto State Bank, and Murdaugh's use of the same to effectuate his wrongful conduct.

m. Engaged in months-long negotiations and lengthy mediation with Palmetto State Bank to gain their agreement to reduce the amount of principal and/or interest owed by Murdaugh on various mortgages and loans issued by Palmetto State Bank, resulting in the elimination of approximately $1,200,000 in priority, secured claims held by the Bank and, therefore, directly benefitting the Receivership fund to that same extent.

n. Engaged brokers, negotiated with prospective purchasers, and closed on the sale of the house on Edisto Island jointly owned by Murdaugh and his wife's estate, resulting in $359,921.87 in net sale proceeds to the Receivership. This sum was augmented by PSB's agreement to release its mortgage lien for on receipt of $153,329.71 instead of $222,525.35 previously agreed to – for a $69,195.64 positive gain for the Receivership fund.

o. Successfully invalidated Murdaugh's execution from prison and filing of a Disclaimer of Interest as the sole beneficiary of the Estate of Margaret Branstetter Murdaugh ("Maggie's Estate") in March 2022, which would have resulted in the transfer of all assets of Maggie's Estate including the property commonly known as "Moselle" from Murdaugh to Buster Murdaugh, as violative of the temporary injunction.

p. Instituted a lawsuit for fraudulent conveyance against the Estate of Margaret Branstetter Murdaugh ("Maggie's Estate") to set aside Murdaugh's conveyance of Moselle to Maggie on December 20, 2016 as fraudulent (the "Fraudulent Conveyance Action").

8

q. Participated in a complex, multi-party mediation over the course of multiple days between known claimants and creditors of Maggie's Estate, resulting in the settlement of the Fraudulent Conveyance Action which yielded the following benefits to the Receivership: (1) it enabled Moselle to be sold, thereby funding the Estate; (2) the Receivership received $275,000 from Maggie's Estate in resolution of the Fraudulent Conveyance Action; (3) the remainder of proceeds from the sale of Moselle were paid to creditors and claimants of Murdaugh and his wife jointly to settle those claims, thereby ultimately reducing the extent of claims to be made against the Receivership's funds; and (4) clearing the way for the Receivership to receive an additional $443,173.89 from the sale of Moselle due to Palmetto State Bank's agreement with the Co-Receivers to reduce the mortgage loan principal and interest.

r. Coordinated with the personal representative of the Estate of Barrett Boulware to engage brokers to sell Williams Island, which was co-owned by Murdaugh and the Estate of Barrett Boulware, negotiated with prospective purchases, and closed the sale of Williams Island. The sale of this property resulted in $101,996.37 in net sale proceeds to the Receivership. The Co-Receivers have worked with the Estate of Barrett Boulware to list seven (7) other islands owned by it and Murdaugh jointly, and such properties are currently for listed for sale at prices totaling $440,000, of which Murdaugh would be entitled to 50% of the sale proceeds, net of brokerage fees and other expenses.

s. Engaged a valuation specialist to review proposed timber prices for the timbering of land in which Murdaugh owns a percentage interest and coordinated with Murdaugh's

family to obtain the court approval necessary to permit the sale of timber to proceed. This timber sale resulted in $26,313.00 being deposited into the Receivership fund.

t. Prepare pleadings in defense of the allegations and the amount sought by the law firm formerly known as Peters, Murdaugh, Parker, Eltzroth & Detrick, P.A. ("PMPED") in the matter captioned *Peters, Murdaugh, Parker, Eltzroth & Detrick, P.A. v. Murdaugh*, Civil Action No. 21-CP-15-00603 (the "PMPED Lawsuit"), to ensure that any judgment entered in favor of PMPED would be supported by competent evidence and reflective of Murdaugh's share of civil liability for the misconduct Murdaugh committed against PMPED's clients.

u. Work extensively with representatives of PMPED to obtain records and information concerning the legal matters handled by Murdaugh, the amount of money misappropriated from PMPED clients, and amounts the Co-Receivers contend owed to Murdaugh by PMPED pursuant to the terms of his employment agreement and his beneficial interest in assets owned by PMPED and/or its affiliated entities. Negotiated an agreement with PMPED to postpone the damages hearing in the PMPED Lawsuit pending PMPED's and the Co-Receivers' attempt to arrive at a negotiated claim amount, which PMPED would then present to the Receivership Court and be subject to its determination of an equitable allocation of the Receivership's funds.

v. Coordinated with representatives of Maggie's Estate regarding the sale of personal property, such as furniture, clothing, jewelry, guns, and vehicles, owned by Maggie's Estate, jointly owned with Murdaugh, and/or located on the premises of Moselle or the Edisto Island house.

w. Achieved a successful resolution to the Murdaugh's desire to potentially withdraw funds from his 401(k) retirement accounts (the "401(k) Accounts") for the compensation of his attorneys Jim Griffin and Dick Harpootlian, which he contended he was entitled to do regardless of the Receivership Order and the Co-Receivers contended that any assets withdrawn from the 401(k) Accounts would be subject to the Receivership Order once withdrawn from such accounts and transferred into a custodial bank account. The Co-Receivers negotiated and entered into an agreement with Murdaugh in October 2022 whereby his 401(k) Accounts would be liquidated in full and he would be entitled to direct the custodian of the retirement account to pay $660,000 therefrom to the IOLTA accounts of his attorneys in exchange for voluntarily agreeing to direct the remainder from the liquidation of the 401(k) Accounts, after taxes and fees, to be placed in the Receivership. The South Carolina Circuit Court approved this negotiated agreement and entered an Order directing the same allocation of monies Murdaugh withdrew from the 401(k) Accounts. This resulted in an additional $424,941.34 being placed in the Receivership.

x. Successfully defended against Murdaugh's, and his attorneys Jim Griffin's and Dick Harpootlian's, subsequent attempt in May and June of 2023 to effectively rescind the October 2022 agreement and associated Court Order concerning his 401(k) Accounts and claw back money that Murdaugh had voluntarily, knowingly, and with the advice of counsel agreed to place into the Receivership. As a result of the Co-Receivers' success in stopping this attempt by Murdaugh's counsel to jump ahead of creditors and victims, the Co-Receivers have concerns about the motivations behind the current motion before the Court.

y. Filed periodic reports and an accounting with the South Carolina Circuit Court to keep the court informed of the Co-Receivers' activities on its behalf as an officer of that court.

16. Our and our counsel's activities outlined above are just a sampling of our efforts over the course of the last twenty-three (23) months. The complexity of Murdaugh's vast network of financial, property, and business interests, as well as extensive legal maneuvers employed by Murdaugh to undermine the Receivership and by others seeking to maximize their claims, have required that the Co-Receivers and their counsel expend more than 3,000 hours of work in furtherance of the Receivership.

17. Pursuant to the spirt and intent of the Receivership and the public interest in transparency, the Co-Receivers petitioned the Receivership Court through public filings each time we sought to sell, liquidate or otherwise dispose of a Subject Asset or proposed to settle a claim by or against Murdaugh. Except in the case of two asset classes of relatively small value[2], the Co-Receivers have sold, liquidated, or otherwise disposed of a Subject Asset only after the Receivership Court reviewed the proposed transaction and entered an Order approving the same. Further, any proposed settlements or settlement agreements negotiated by the Co-Receivers of claims by or against Murdaugh have been finalized only after the Receivership Court reviewed the proposed settlement and entered an Order approving the same.

18. We have endeavored to, and have, communicated with Murdaugh's lawyers regarding the Co-Receivers' actions through regular, direct communications and through notice of

---

[2] Pursuant to the authority granted in the Receivership Order, the Co-Receivers sold a 30-year old dump truck for $3,000 and a "jon boat" for $4,085.22 (net of fees) without seeking a prior order from the Receivership Court approving these sales. The Co-Receivers investigated the fair market value for these assets and determined these sale prices were reasonable.

public filings made in the Receivership Court or in other courts presiding over matters applicable to Murdaugh.

19. On motions by the Co-Receivers and following a public hearing, and without objection to such motions from Murdaugh or his attorneys or from any claimant or creditor of Murdaugh, the Receivership Court entered orders on December 8, 2022, and September 1, 2023 approving disbursements from the Receivership totaling $641,442.14 for payment of the Co-Receivers' and our counsels' fee equal to 30% of the assets recovered and marshaled into the Receivership, net of fees and expenses, as well as approving the reimbursement of expenses incurred by the Co-Receivers' and/or their counsel's firm Gallivan, White & Boyd, PA in an amount totaling $17,755.61.[3] Murdaugh and his attorneys had every opportunity to object to the Co-Receivers' motions for their fees but they did not do so.

20. The total compensation paid to us and our counsel represents a substantial discount relative to standard hourly fees for this same work which would ordinarily total more than $900,000 and to the standard contingency rates of 40%, which upon review of PMPED records and personal experience, Murdaugh himself used to charge when he practiced law. As represented to the Receivership Court at the August 25, 2023, hearing on the Co-Receivers' application for fees and expenses, we do not anticipate requesting or receiving any additional payment of fees from the Receivership for our or our counsel's remaining work. However, we reserve the right to request fees for future work if additional assets are discovered or other circumstances reasonably warrant this.

---

[3] The Receivership Court approved the Co-Receivers' and our counsel's fees of $401,396.39 and ordered payment of the same on December 8, 2022. Further, the Receivership Court approved the Co-Receivers' and our counsel's fees of $242,295.75 (pursuant to the calculation adopted by the Court, ultimately $240,045.75) and ordered payment of the same on September 1, 2023. Pursuant to these Orders, these fees have been disbursed from the Receivership fund.

21. Contrary to Murdaugh's assertion in his motion to this federal Court, these fees and expense reimbursement amounts had already been approved and awarded prior to Murdaugh's filing of his motion with this Court in the above captioned matter.

22. Our investigation of actions and proposed actions by Murdaugh and his agents and representatives revealed that, from at least December 20, 2016 and certainly following the boat crash that killed Mallory Beach on February 24, 2019 until the South Carolina Circuit Court's implementation of the injunction and establishment of the Receivership, Murdaugh took many actions to place his assets out of reach of his many victims, purposely and knowingly dissipated his assets, and was responsible for substantial waste of his assets on account of neglect, mismanagement, expenditure of money on his purported drug addiction and other improprieties. The South Carolina Circuit Court's implementation of the injunction and establishment of the Receivership halted this concealment, dissipation, and waste so that the Co-Receivers could work to marshal gross assets valued at more than $2.4 million into the Receivership.

23. Our investigation over the course of the last twenty-three (23) months makes it clear that there would not be any money for Murdaugh's victims – either civil or criminal, in the absence of South Carolina's implementation of the receivership. Murdaugh would have disclaimed his interest in Maggie's Estate (as he attempted to do but we successfully undermined) and any other assets that would have remained in Murdaugh's name would have been owed to Palmetto State Bank in light of the face value of the principal and interest the Bank claimed Murdaugh owed it. Accordingly, the irony of Murdaugh's request in his motion to this Court – that the Receivership funds should now be seized by the federal government away from the South Carolina Circuit Court, which holds such funds *in custodia logis*, due to purported "waste and dissipation" by the Co-Receivers – is not lost on us.

24.  The current cash balance in the Receivership fund is $1,500,783.54. This Receivership fund will receive additional monies following the sale of the seven (7) islands owned jointly with the Estate of Barrett Boulware, the sale of Murdaugh's 1/6 interest in real property held jointly with family members, and the sale of a dilapidated boat. We estimate that the disposition of these remaining Subject Assets should yield approximately $269,000 (less applicable brokerage fees and other expenses) in additional cash to be placed in the Receivership fund.

25.  Of the sums included in the Receivership fund, $718,173.89 is directly associated with the resolution of (1) the Co-Receivers' Fraudulent Conveyance Claim against the Estate of Margaret Murdaugh, and (2) the resolution of potential claims against Palmetto State Bank. Additionally, as detailed above, the Co-Receivers obtained the agreement of Palmetto State Bank to release its mortgage liens against certain real property in exchange for receipt of funds totaling more than $1,000,000 less than the Bank had previously demanded from Murdaugh. Asserting such claims and resolving them to the benefit of the Receivership is not within the purview of federal criminal forfeiture proceedings and represents a benefit exclusively on account of the South Carolina Circuit Court's ability to appoint a receiver to act on its behalf.

26.  As part of the settlement of all claims against Maggie's Estate, including claims against the Estate and Murdaugh jointly, Murdaugh voluntarily, knowingly, and with the advice of his counsel Jim Griffin and Dick Harpootlian, executed a Waiver of Objection and Appeal of the Receivership Order on March 22, 2023. [**Exhibit 6** – Waiver of Objection and Appeal].

27.  On August 3, 2022, the Co-Receivers filed our Motion for Entry of Scheduling Order for the Allocation of Receivership Funds in Final Resolution of Eligible Claims and Judgments Against R. Alexander Murdaugh, Sr. and for the Appointment of a Special Referee to

Administer the Claims Process with the Receivership Court. Following a public hearing on August 25, 2023, and without objection from Murdaugh, his counsel, or any of his creditors or claimants, the Receivership Court entered its Order on September 19, 2023, setting forth the process for the Receivership's funds to be equitably allocated amongst Murdaugh's many eligible creditors and claimants. [**Exhibit 7** – Order dated 9/19/2023]. Murdaugh and his attorneys had every opportunity to object to the Co-Receivers' motion proposing the process for equitable allocation of the Receivership funds but they did not do so. This process is designed to take place quickly and should result in an award distributing assets to victims and creditors no later than February 5, 2024.

28. The Receivership Court also appointed L. Walter Tollison, III, Esq. ("Walt Tollison") as special referee to implement and administer the process and schedule ordered by the court. [Id.]

29. Our evaluation of Walt Tollison's experience to serve as special referee and the fees he estimated to serve in this capacity satisfied us that his service would serve the legitimate interest of judicial economy and efficient resolution of eligible creditors' and claimants' claims against Murdaugh.

_____
John T. Lay, Jr.
Co-Receiver

Sworn to and subscribed before me
This 4th day of October, 2023

_____
Notary Public for the State of South Carolina

Print Name: Kelly Edrington

My Commission Expires: May 3, 2028

16

 

_____
Peter M. McCoy
Co-Receiver

Sworn to and subscribed before me
This ____ day of October, 2023

_____
Notary Public for the State of South Carolina

Print Name: __Allison Swartz__

My Commission Expires: __June 7 2032__



17