**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**BEAUFORT DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal No.: 9:23-cr-0396-RMG |
| vs. | **DEFENDANT MURDAUGH'S** |
| | **SENTENCING MEMORANDUM** |
| RICHARD ALEXANDER MURDAUGH | |
| Defendant. | |

INTRODUCTION

Defendant, Richard Alexander Murdaugh, through undersigned counsel, hereby submits his sentencing memorandum for the Court's consideration in advance of the hearing scheduled for April 1, 2024. We address Murdaugh's objections to the guideline calculations in the Presentence Investigative Report (PSR) and discuss the applicable guideline provisions imposing a concurrent sentence with the undischarged state sentence Murdaugh is currently serving for the same conduct.

In addition, we address the Government's late filed motion contending that Murdaugh breached his plea agreement by failing to pass a polygraph administered by the Federal Bureau of Investigation. The Government's motion is untimely and should not be considered at the currently scheduled sentencing hearing because a full evidentiary hearing, affording Murdaugh his Sixth Amendment right to confront the polygrapher examiner, will be necessary to address the Government's assertion that Murdaugh failed a polygraph examination. There are legitimate questions as to whether the Government intentionally manipulated the results to void the plea agreement and achieve the prosecutors' stated desire to "ensure that he's never a free man again."

1

*Alex Murdaugh Pleads Guilty*, *AP News September 21, 2023*. https://apnews.com/article/alex-murdaugh-financial-crimes-guilty-aa2a5b2d06113a213f0c8cec4475f302

The polygraph examiner engaged in what can only be described as odd conduct during the pre-test interview, first declaring his belief that Murdaugh is innocent of the murders of his wife and son, and then "secretly"[1] confiding in Murdaugh that he had just returned from performing a polygraph examination on Joran Van der sloop regarding the murder of Natalee Holloway. The polygraph examiner also argued with Murdaugh over the meaning of "hidden assets" which the examiner used in his test question. As explained herein, this alone could have caused Murdaugh to react to the question. The Government has also refused to produce the charts of the polygraph examination so we can have them examined by an expert to determine whether the Government has accurately scored the results. Instead, the Government asks the Court to credit its accusation that Murdaugh breached his plea agreement while denying him an opportunity to dispute the accusation in a meaningful manner.

I.    <u>Guideline Objections</u>

    A.  Criminal History Calculation

We have objected to adding three (3) criminal history points for a tax plea and concurrent sentence with all other financial crimes to which Murdaugh plead guilty in the same state court proceeding.   PSR ¶ 125 This conviction should not be included under Section 4A1.2 of the United States Sentencing Guidelines (USSG) because it involves conduct that is part of the instant offense.

Section 4A1.2 defines the term "prior sentence" as "any sentence previously imposed upon adjudication of guilt, whether by guilty plea, trial, or plea of <u>nolo contendere</u>, for conduct not part

---

[1] The FBI agent asked Murdaugh, if he could keep a secret, and then claimed he had just come from Alabama where he polygraphed Joran Van der sloop.

of the instant offense." The phrase "conduct not part of the instant offense" is to be determined with reference to Section 1B1.3, which defines relevant conduct. *United States v. Smith*, 187 F. App'x 330 (4th Cir. 2006) (unpublished); *United States v. Morgan*, 219 U.S. App. Lexis 37613 (6th Cir. 2019)  *United States v. Yerena-Magana*, 478 F.3d 683 (5th Cir. 2007);  *United States v. Charniak*, 607 F. App'x 936 (11th Cir. 2015).

"Relevant conduct" includes all acts and omissions committed by the defendant during the commission of the instant offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense. Section 1B1.3 USSG. Section 1B1.3(a)(3) states "solely with respect to offenses of a character for which §3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction."

Tax offenses are properly grouped with fraud offenses under §3D1.2(d) when the tax offenses are part of a continuous course of criminal conduct involving the same funds. *United States v. Petrillo*, 237 F.3d 119 (2d Cir. 2000); *United States v. Gordon*, 291 F.3d 181, 192–93 (2d Cir. 2002) (reaffirming *Petrillo* and requiring grouping of tax evasion and mail fraud counts under subsection (d) of § 3D1.2), *cert. denied*, 537 U.S. 1114 (2003). As a result, tax offenses are considered relevant conduct under Section 1B1.3(a)(3) pertaining to fraud offenses if the tax offense was part of the same course of conduct.

In *Petrillo,* the Court explained:

> [B]oth tax evasion and mail fraud follow offense level schedules that trigger substantially identical offense level increments based on the amount of loss. Moreover, the offenses here were both frauds, were part of a single continuous course of criminal activity and involved the same funds. It is true that the tax and fraud offenses involved different victims, an argument against grouping. However, this alone is not dispositive. Application Note 6 strongly suggests

that "the mere fact that [defendant's] … counts harmed different victims is … insufficient to establish that these counts cannot be grouped under subsection (d)." *Napoli*, 179 F.3d at 9. Based on this reading of the Guidelines and *Napoli*, we agree with the parties that the mail fraud and tax evasion counts here should be grouped and Petrillo's sentence adjusted accordingly.

*Id.* at 125

In *United States v. Haltom*, 113 F.3d 43 (5th Cir. 1997) the Court likewise ruled that a conviction for tax evasion should be grouped with a mail fraud conviction. The Court observed,

Section 3D1.2 specifies the circumstances in which multiple counts must be grouped together. When counts are grouped, they are essentially treated as a single offense for sentencing purposes. The stated purpose of the grouping rules is to ensure that a defendant convicted of multiple offenses receives "incremental punishment for significant additional criminal conduct." U.S.S.G., Ch. 3, Pt. D, Introductory Commentary. The operative word is "significant."

*Id.* at 45.

Here, the tax offense to which Murdaugh pled guilty in state court was part of a single continuous course of criminal activity involving the same proceeds obtained through the fraud offense conduct. Moreover, the state tax charge does not involve "significant additional criminal conduct." As such, the state tax charge is "relevant conduct" as defined under Section 1B1.3(a)(3) and Murdaugh should not receive criminal history points for these convictions.

B.  Loss Amount

The summary loss amount set forth in paragraph 106 is incorrect in the following respects. The PSR reports a loss amount of $792,000 for the Faris fees allegedly stolen from PMPED. The $792,000 in fees owed to PMPED from the Wilson Law Firm for Murdaugh's representation was originally diverted to Murdaugh personally. However, before the scheme was detected, Murdaugh

returned $600,000 to the Wilson Law Firm so that Wilson could pay PMPED. Ultimately, Wilson loaned Murdaugh $192,000 and paid the full amount owed to PMPED.

In addition, the remaining loss amount attributed to PMPED is overstated. Loss is defined under Application Note 3 to Section 2B1.1 USSG as "the reasonably foreseeable pecuniary harm that resulted from the offense." Pecuniary harm means "harm that is monetary or otherwise is readily measurable in money." Id. The total amount of PMPED fees that Murdaugh diverted to himself is not an accurate measure of pecuniary harm to the firm.

Under the partnership compensation formula, each partner was entitled to a year-end distribution of 92.5% of the total fees the partner earned through the firm, after payment of the partner's pro-rata share of the firm overhead. The remaining 7.5% was deposited into a fund that was then distributed to all partners on a pro-rata basis.

Murdaugh collected sufficient funds to cover his pro-rata share of the firm's overhead every year in which he diverted fees to himself personally. Thus, Murdaugh would have been entitled to receive at least 92.5% of the total amount of diverted funds.

The pecuniary loss to PMPED is therefore limited to 7.5% of the diverted amount. According to the summary table in paragraph 125, Murdaugh "stole" $1,481,935.49 by diverting attorneys' fees to himself. Murdaugh was entitled to receive at least 92.5%, or $1,370,790.33 according to the firm's compensation formula. The pecuniary harm, or loss to PMPED is therefore limited to $111,145.16 if the Faris fee is included. However, when the Faris fee of $792,000 is properly excluded from the loss amount calculation, the pecuniary harm to PMPED is reduced to $51,745.6. This reduces the total loss amount to $9,456,356.99, which in turn reduces the loss enhancement from 20 levels to 18 levels pursuant to 2B1.1(b)(1)(J).

II.    Sentencing Guideline Section 5G1.3 Directs that Murdaugh Receive a Concurrent
Sentence to His Undischarged State Sentences for All Financial and Tax Crimes

Section 5G1.3 USSG provides that the sentence for the instant offense "shall be imposed to run concurrently to the undischarged term of imprisonment" for another offense that is relevant conduct to the instant offense. § 5G1.3(b)(2). The Court is also directed to adjust the sentence for any period of imprisonment already served on the undischarged term of imprison. §5G1.3(b)(1). As discussed above, the tax charge as well as all other financial crimes[2] for which Murdaugh has been sentenced in state court, is relevant conduct to the instant offense.

However, the convictions relating to the murders of Maggie Murdaugh and Paul Murdaugh clearly are not relevant conduct. Therefore, the policy statement in Section 5G1.3(d) is applicable. Section 5G1.3(d) states:

> In any other case involving an undischarged term of imprisonment, the sentence for the instant offense may be imposed to run concurrently, partially concurrently, or consecutively to the prior undischarged term of imprisonment to achieve a reasonable punishment for the instant offense.

*Id.*

Application note 4A states:

> Under subsection (d), the court may impose a sentence concurrently, partially concurrently, or consecutively to the undischarged term of imprisonment. In order to achieve a reasonable incremental punishment for the instant offense and avoid unwarranted disparity, the court should consider the following:
>
> (i)    the factors set forth in 18 U.S.C. § 3584 (referencing 18 U.S.C. § 3553(a));
>
> (ii)    the type (e.g., determinate, indeterminate/parolable) and length of the prior undischarged sentence;
>
> (iii)   the time served on the undischarged sentence and the time likely to be served before release;

---

[2] The PSR finds that only the tax offense is not relevant conduct. See ¶ 125. Murdaugh received a five year concurrent sentence on the tax conviction.

(iv)  the fact that the prior undischarged sentence may have been imposed in state court rather than federal court, or at a different time before the same or different federal court; and

(v)  any other circumstance relevant to the determination of an appropriate sentence for the instant offense.

Because Murdaugh is serving two life sentences without the possibility of parole for the murder convictions there is nothing to be gained by imposing a consecutive sentence. Murdaugh will die in state custody and never serve a day of consecutive time. If Murdaugh's murder and related convictions are vacated on appeal or through a federal habeas action, then there will not be any active sentence with which to run consecutively.

III.  <u>This Court Should Deny the Government's Motion Declaring Murdaugh in Breach of his Plea Agreement, or Delay Ruling on the Motion Until the Government Provides Murdaugh with the Polygraph Charts</u>

The Government's conduct leading up to the polygraph examination and the agent's conduct during the examination raises significant concerns as to whether the Government has acted in good faith. Immediately following Murdaugh's guilty plea, prosecutors declared to the press that the reason Murdaugh was federally prosecuted was to "ensure he's never a free man again."[3] This statement was made even though pursuant to the plea agreement, the prosecutors agreed to recommend to the court, consistent with the federal sentencing guidelines, that the federal sentence run concurrently with his state sentence. In a follow-up conversation about this seemingly contradictory statement, the undersigned counsel was advised that Murdaugh must pass a polygraph examination to obtain the benefit under the plea agreement.

Then, after conducting four interviews with Murdaugh over a six-month period, prosecutors demanded that Murdaugh submit to a polygraph examination regarding his assets. This

---

[3] Alex Murdaugh Pleads Guilty to Financial Crimes, AP News, Sept. 21, 2023, *available at* https://apnews.com/article/alex-murdaugh-financial-crimes-guilty-aa2a5b2d06113a213f0c8cec4475f302

struck the undersigned as very curious since Murdaugh had never been requested to identify any of his assets in prior interviews. During the pre-test interview, Murdaugh expressed confusion and uncertainty regarding the agent's use of the term "hidden assets," primarily because Murdaugh had never been requested to identify his assets and he was unsure which assets the investigators and the State appointed receiver had identified. Yet, the polygraph examiner used this exact term during the test,

The polygraph examiner's questions run afoul of the following standards for designing polygraph questions issued by the Global Polygraph Network (GPN):

- Questions cannot be subjective or ambiguous. Each question must be interpreted the same way by any person who hears it. For example, if there is a question about having "sex" with someone, the term "sex" must be defined (vaginal, oral, anal, manual, virtual, etc.)  When in doubt, specific words or phrases can be defined and agreed-upon before the exam.

- Questions must be about what the examinee has disclosed to the examiner, not to someone else.  For example, "Did you tell your boss about everything you stole from him?" is not a proper questions, although the question "Besides what you told me, did you steal anything else from your boss?" would be valid.  All relevant disclosures must be made to the examiner first so the examiner can verify those disclosures.

- Questions about lying are not generally used.[4] Polygraph questions are asked in the most direct way possible. For example, we would prefer to ask "Did you steal the missing wallet?" rather than "Are you lying about stealing the missing wallet?"

*Polygraph Question Design Rules*, GPN https://www.polytest.org/polygraph-question-rules/

Even the Department of Justice acknowledges that the design of the relevant question is a significant variable, causing examinees to react to the question. DOJ, Crim. Resource Manual Section 261 (https://www.justice.gov/archives/jm/criminal-resource-manual-261-polygraphs-

---

[4] The polygraph examiner also tested Murdaugh on whether he was "lying" about his statement regarding "hidden assets."

examination-variables ) Here, it appears that the polygrapher designed the relevant question in such a way to ensure that Murdaugh would fail the exam, in an effort to accomplish the prosecutor's stated goal of ensuring "that he will never be a free man again."

In addition, the polygraph examiner's conduct during the pre-interview process was odd at best. The examiner upon meeting Murdaugh exclaimed that he did not believe Murdaugh murdered his wife and son. The examiner also inquired who Murdaugh thought killed his wife and son. In response to this inquiry Murdaugh asked the examiner to polygraph him on his wife and son's murders. The examiner refused. The examiner also purported to secretly confide in Murdaugh that he had just come from Alabama where he conducted a polygraph examination of Joran Van de sloop about the murder of Natalee Holloway.

Upon learning that the Government contends Murdaugh failed the polygraph, the undersigned requested charts of the tests so that we could have an independent expert review them. The Government refused our request. Without these charts, Murdaugh cannot effectively cross examine the polygrapher who contends Murdaugh failed the test. To be clear, Murdaugh objects to the Government's reliance upon a written report where an examiner simply checks a box to establish that Murdaugh breached the plea agreement. Murdaugh has a Sixth Amendment right to cross exam the polygrapher regarding his administration of the polygraph exam and the scoring of the same. *See*, *Melendez-Diaz v. Massachusetts,* 557 U.S. 305 (2009) (applying *Crawford v. Washington* to forensic lab reports); *Bullcoming v. New Mexico*, 131 S.Ct. 2705, 2716-17 (2011) (Blood alcohol analysis report). Murdaugh will also be deprived of his opportunity to present expert testimony regarding the validity of the polygraph examiner's scoring of the test if the charts are not provided.

Murdaugh therefore objects to the Court addressing the Government's motion until after the Government has produced the polygraph charts in advance of a hearing, giving counsel a sufficient opportunity to review and analyze the same, in consultation with a polygraph expert. If the Government is unwilling to provide the underlying charts to the defense, then this Court should deny the motion.

IV.    <u>This Court should not rely upon Polygraph Results as Evidence of Truthfulness</u>

The United States Department of Justice's Criminal Resource Manual says it best:

In light of present scientific evidence the Department of Justice continues to agree with the conclusion of the Committee on Governmental Operations of the House of Representatives, which held after extensive hearings in 1965:

**There is no "lie detector." The polygraph machine is not a "lie detector," nor does the operator who interprets the graphs detect "lies."** The machine records physical responses which may or may not be connected with an emotional reaction--and that reaction may or may not be related to guilt or innocence. Many, many physical and psychological factors make it possible for an individual to "beat" the polygraph without detection by the machine or its operator.

H.R.Rep. No. 198, 89th Cong., 1st Sess. 13 (1965). Following further hearings and study, the same conclusions were reached in 1976. The Use of Polygraphs and Similar Devices by Federal Agencies: Hearings on H.R. 795 Before the House Comm. on Government Operations, 94 Cong., 2d Sess. (1976). And in 1988, as a result of continuing doubts about the usefulness and accuracy of polygraphs as a means of detecting deceit, Congress restricted the use of polygraphs in employment decisions. 29 U.S.C. §§ 2001 et seq.

Crim. Resource Manual §259 ([https://www.justice.gov/archives/jm/criminal-resource-manual-259-polygraphs-general](https://www.justice.gov/archives/jm/criminal-resource-manual-259-polygraphs-general)) (emphasis added)

The South Carolina Attorney General takes the same view as the Department of Justice, rejecting the idea that a polygraph detects lies. In a pre-trial filing in the murder case, Murdaugh disclosed that Curtis Eddie Smith failed a polygraph exam administered by SLED regarding his knowledge and/or involvement in the murders of Maggie and Paul. In response, the Attorney General stated,

A polygraph examination is a procedure in which a subject is measured for certain physiological and psychological reactions while responding to questions in a controlled environment. **The polygraph machine is not a "lie detector," nor does the operator who interprets the test "detect lies;"** rather the machine records physical responses from which an examiner may draw somewhat subjective inferences about whether the examinee is being deceptive or otherwise motivated by a sense of guilt or some other emotion.

*State's Response in Opposition to Motion to Compel*, Exhibit A (emphasis added).

Assuming Murdaugh did in fact "flunk" the polygraph as reported in the press, the only conclusion that can be drawn is that he had a physiological and/or psychological reaction to the relevant questions. Nothing more. The Department of Justice's own policy manual precludes the federal prosecutors from claiming that Murdaugh was lying or being deceptive.  Simply put, a polygraph machine does not detect lies.

Finally, the Government's motion is untimely.  The polygraph examination took place on October 18, 2023, and the final review of the results was completed by October 26, 2023.  The Government knew no later than October 26, 2023, that it would move for a finding that Murdaugh breached his plea agreement (and, as explained above, it decided to do so even earlier).  Yet the Government waited five months before filing its motion barely more than two business days (the filing was made in the late afternoon) before sentencing.  The unavoidable inference is that the Government engaged in deliberate delay to impede careful judicial scrutiny of its position.

V.    A Sentence within the Guidelines is an Appropriate Disposition

Defendant Murdaugh has fully accepted responsibility for his own actions. He pled guilty to all the charges brought against him in this Court. He has also pled guilty and been sentenced to 27 years in State court for the same conduct. He will have to serve 85% of the state court sentence. Murdaugh is 55 years old and therefore won't be eligible for release on the State financial charges until he is at least 77 years old. Furthermore, during the last five years, defendants sentenced in

federal court with the same guideline offense level and criminal history as Murdaugh received on average a sentence of 168 months. PSR ¶ 209, and a median sentence of 210 months.[5]

There is no basis for an upward to the sentencing guideline range. In Section 5K USSG, the United States Sentencing Commission identifies the following grounds for an upward departure: Death (§5K2.1), Extreme Physical Injury (§5K2.2), Extreme Psychological Injury (§5K2.3), Abduction or Unlawful Restraint (§5K2.4), Extreme Conduct (§5K2.8) ("the defendant's conduct was unusually heinous, cruel, brutal, or degrading to the victim, the court may increase the sentence above the guideline range to reflect the nature of the conduct."), Weapons and Dangerous Instrumentalities (§5K2.6), Semiautomatic Firearms Capable of Accepting Large Capacity Magazine (§5K2.17), Violent Street Gangs (§5K2.18), Property Damage or Loss (§5K2.5), Disruption of Governmental Function (§5K2.7), Public Welfare (§5K2.14), Commission of Offense While Wearing or Displaying Unauthorized or Counterfeit Insignia or Uniform (§5K2.24), Criminal Purpose (§5K2.9)(the defendant committed the offense in order to facilitate or conceal the commission of another offense, the court may increase the sentence above the guideline range to reflect the actual seriousness of the defendant's conduct.) and Dismissed and Uncharged Conduct (§5K2.21). None of these grounds are present here.

As egregious as Murdaugh's criminal conduct was, his misconduct must be viewed along with his 20-year severe opioid addiction. PSR ¶ 180. He began abusing and became addicted to hydrocodone in the early 2000s, initially obtaining them through prescriptions and later began purchasing the drugs on the black market. Subsequently, he switched to oxycodone. Murdaugh reports that he attempted to quit on his own, "countless times, 60-100." *Id*. He was treated at a

---

[5] The Probation Office calculated Murdaugh's sentencing guideline sentencing range at 210 to 262 months. PSR ¶ 187.

detox facility on three separate occasions, December 2017, October 2018, and September 2021. After the completion of detox in September 2021, he was then admitted to a long-term rehab facility in Orlando, Florida. *Id.* He was arrested on the day of his discharge and has been in custody ever since.

Murdaugh has cooperated with the federal government in their ongoing investigation. He has been interviewed on four separate occasions over a six-month period. In addition, the clients from whom he stole, who are vulnerable victims, have been fully reimbursed for their financial losses. Many have even recovered more money through threats of litigation than they ever would have received if Murdaugh had not stolen from them. These reimbursements were made by Murdaugh's former law partners, who obviously cannot be considered vulnerable, the law firm's insurance carrier, Palmetto State Bank and other third parties.

## CONCLUSION

We respectfully request that the Court impose a sentence within the guidelines to run concurrently with Murdaugh's undischarged State sentence imposed for the same conduct. A guideline sentence will be sufficient, but not greater than necessary to comply with the purposes set forth in Title 18 United States Code, Section 3553(a)(2).

Respectfully submitted,

By: *s/ James M. Griffin*
   James M. Griffin, Fed. ID. No. 1053
   Margaret N. Fox, Fed. ID. No. 10576
   GRIFFIN HUMPHRIES, LLC
   4408 Forest Dr., Suite 300 (29206)
   Post Office Box 999 (29202)
   Columbia, South Carolina
   (T) 803.744.0800
   (F) 803.744.0805
   jgriffin@griffinhumphries.com
   mfox@griffinhumphries.com

Richard A. Harpootlian (Fed. ID No. 1730)
Phillip D. Barber (Fed. ID No. 12816)
RICHARD A. HARPOOTLIAN, P.A.
1410 Laurel Street (29201)
Post Office Box 1090
Columbia, SC 29201
(803) 252-4848
(803) 252-4810 (facsimile)
rah@harpootlianlaw.com
pdb@harpootlianlaw.com

Attorney for Richard Alexander Murdaugh

March 28, 2024
Columbia, South Carolina