IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | CRIMINAL NO. 9:23-396-RMG |
| | ) | |
| **vs.** | ) | |
| | ) | |
| | ) | |
| **RICHARD ALEXANDER MURDAUGH** | ) | |
| | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The Defendant, Richard Alexander Murdaugh, pleaded guilty to 22 financial crimes: conspiracy to commit wire fraud and bank fraud, in violation of 18 U.S.C. § 1349 (Count 1); bank fraud, in violation of 18 U.S.C. § 1344 (Count 2); wire fraud affecting a financial institution and wire fraud, in violation of 18 U.S.C. § 1343 (Counts 3 through 7); conspiracy to commit wire fraud, in violation of 18 U.S.C. §§ 1343 and 1349 (Count 8); and money laundering, in violation of 18 U.S.C. § 1956 (Counts 9 through 22). The United States Probation Office ("USPO") prepared a presentence report ("PSR") outlining an advisory guideline range of 210 to 262 months. Murdaugh will be sentenced on April 1, 2024.

Murdaugh has submitted two objections to the PSR, challenging the loss amount and criminal history calculations. Neither objection has merit.

The Government addresses the statutory sentencing factors below but defers a recommendation on the appropriate sentence pending resolution of the Government's motion to hold Murdaugh in breach of his plea agreement.[1] Dkt. 65.

---

[1] Unless and until the Court holds Murdaugh breached the plea agreement, the Government remains bound by the recommendation "that the sentence imposed on these charges be served concurrent to any state sentence imposed for the same conduct." Dkt. 37, ¶ 7; *see United States v. Simmons*, 537 F.2d 1260, 1261 (4th Cir. 1976) (holding that Government cannot unilaterally

1

## I. The Presentence Report

The PSR calculated an advisory guideline range of 210 to 262 months, based on a Total Offense Level 34 and a Criminal History Category IV. It found that between September 2005 and October 2021, Murdaugh used his position as a personal injury attorney to steal $10,901,547.32 in settlement proceeds from his clients and his law firm. PSR ¶ 107. He laundered at least $6,140,181.77 of the stolen funds through bank accounts he called "Forge," to make it appear that the funds were being transferred into legitimate accounts run by Forge Consulting, LLC. PSR ¶¶ 33, 107. The PSR found he stole from more than ten victims as a part of his role in leading and/or organizing a jointly undertaken criminal activity with Russell Laffitte, Cory Fleming, and Chris Wilson during their participation in the conspiracy. PSR ¶ 108. It found the offenses involved complex or especially intricate conduct during both their execution and their concealment. PSR ¶ 108. And it found that Murdaugh's role as the victims' attorney significantly facilitated the commission and concealment of the sophisticated scheme. PSR ¶ 108. The PSR imposed enhancements for affecting more than ten victims; victimizing vulnerable individuals; abusing a position of trust as a lawyer; using sophisticated means; and being an organizer and leader. PSR ¶¶ 142–173.

## II. Government's Response to Murdaugh's Objections to the Presentence Report

Murdaugh submitted two objections to the PSR. First, he argues that the loss amount improperly includes a $729,000 fee he claims he repaid and that it should be substantially reduced to account for money he claims he would have received from his law firm under his Employment

---

determine that a defendant has breached plea agreement); *United States v. Wilson*, 841 F. App'x 571, 575 (4th Cir. 2021) (unpublished) ("[T]he government may be relieved of its obligations under a plea agreement only after a hearing and a district court finding that the defendant has breached.").

Agreement. Second, Murdaugh contends that the PSR improperly attributed three criminal history points for his conviction of a state tax offense.[2] *Def.'s Objs.* The USPO declined to revise the loss amount or criminal history category in response to Murdaugh's objections. The Court should overrule Murdaugh's objections and find that the PSR correctly calculated the guideline range to be 210 to 262 months.

### A. The PSR Correctly Calculated the Loss Amount

The PSR attributed a total loss of $10,901,547.32, including $1,481,935.49 Murdaugh stole from the law firm and $9,419,611.83 he stole from individual clients. PSR ¶ 106. Murdaugh raises two challenges to the loss amount attributed for theft from the law firm. *Def.'s Obj*. Both are contrary to law and logic.

#### i.     $792,000 Faris Fee

The PSR correctly holds Murdaugh accountable for a $792,000 theft from his law firm, Peters Murdaugh Parker Eltzroth & Detrick ("PMPED"). PSR ¶ 106. The $792,000 relates to a personal injury case known as the "Faris" case, in which Murdaugh's friend and fellow attorney Chris Wilson associated Murdaugh. PSR ¶¶ 96–97. Murdaugh and Wilson obtained a large recovery for the client and received substantial attorneys' fees. *Id.* Wilson's law firm paid PMPED directly for expenses incurred on the case, but PMPED never got a check for Murdaugh's legal fees. PSR ¶ 96. Murdaugh admits in his objections that the $792,000 fee owed to PMPED was "diverted to Murdaugh personally." *Def.'s Obj*.

---

[2] In his objections, Murdaugh also claims that he has not had an opportunity to confirm the accuracy of information in the PSR with respect to some of the losses dating back to 2005. *Def.'s Objs.* On December 12, 2023, the Government produced all of the documentation supporting this loss calculation to defense counsel.

3

In the Spring of 2021, employees at the law firm began to ask questions about the missing fee, fearing that Murdaugh was trying to hide assets to lessen his exposure in litigation related to a 2019 boating accident involving his son. PSR ¶ 96. PMPED employees questioned Murdaugh and Wilson's employees about the missing fees. PSR ¶ 96. On June 7, 2021, after several months without answers from Murdaugh and Wilson's staff, a law firm employee confronted Murdaugh about the missing funds, demanding proof that he did not have them. PSR ¶ 97. Their conversation was interrupted when Murdaugh received a phone call about his terminally ill father. PSR ¶ 97. That night, Murdaugh's wife and son were murdered.[3] PSR ¶ 97.

On July 19, 2021, in response to the law firm's persistent inquiries regarding the missing fees, Wilson emailed Murdaugh to confirm that the $792,000 was in his trust account. PSR ¶ 97.

In September 2021, after PMPED uncovered Murdaugh's decades of thefts, Wilson finally paid the law firm the $792,000 it was owed from the Faris case. PSR ¶ 97.

Murdaugh claims that the $792,000 should not be attributed as loss because it was paid back to the law firm before detection. *Def.'s Obj.* But he did not return any part of the $792,000 before detection, and his objection should be overruled.

U.S.S.G. § 2B1.1, Application Note 3(E)(i) provides that loss should be reduced by money returned by the defendant (or other persons acting jointly with the defendant) to the victim *before the offense was detected*. The time of detection of the offense is the earlier of (i) the time the offense was discovered by the victim or (ii) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency. *Id.*

---

[3] Murdaugh was convicted of their murders in March 2023 and sentenced to Life in prison. PSR ¶ 126.

Murdaugh claims he returned $600,000 to Wilson so Wilson could pay PMPED, *Def.'s Obj*, but the only reason the money was paid back into Wilson's trust account was because the law firm had detected Murdaugh's diversion of the funds. Murdaugh was confronted on June 7, 2021, by a firm employee demanding proof that he did not have the missing funds. PSR ¶ 97. The money Murdaugh admits was diverted to him personally, *Def.'s Obj.*, was paid back into Wilson's trust account *after* that confrontation, and after months of law firm employees' attempts to locate the missing fees. PSR ¶¶ 96–97. More importantly, the law firm—the victim of the theft—was not paid until September, after they uncovered Murdaugh's crimes.[4] The loss amount should not be reduced under § 2B1.1, Application Note 3(E)(i).

### ii.     Other Stolen Fees

The PSR also correctly holds Murdaugh accountable for $1,481,935.49 in fees that he stole from PMPED. PSR ¶ 106. Murdaugh claims that amount should be reduced by 92.5% because, under the law firm's compensation package, PMPED would have only retained 7.5% of Murdaugh's fees. *Def.'s Objs.* But Murdaugh breached his Employment Agreement with the law firm by stealing from his clients and from the firm. The Government intends to call Ronnie Crosby, a partner at the law firm, to testify about the firm's Employment Agreement, its compensation structure, and the actions the firm took once Murdaugh's thefts were uncovered. Crosby's testimony will establish that after Murdaugh breached the Employment Agreement, he was not entitled to keep any portion of the stolen fees.[5]

---

[4] If necessary, the Government is prepared to present testimony from FBI Forensic Accountant Cyndra Swinson regarding the movement of $792,000 out of and back into Wilson's trust account and Wilson's subsequent payment to the law firm in September 2021.

[5] The Government intends to submit a copy of PMPED's Employment Agreement as an exhibit during the sentencings. Under PMPED's compensation structure, all attorneys' fees are owed to the law firm directly. At the end of the year, a percentage is collected to cover overhead, and the remaining income is paid out to the partners. Murdaugh agreed to "devote his full time, attention,

5

Murdaugh clearly—and repeatedly—breached the Employment Agreement. In six cases, he stole from both his client and the law firm. PSR ¶ 106. He stole from the firm in two more cases. PSR ¶ 106. Stealing client settlement funds violated the express terms of the Employment Agreement, as did Murdaugh's theft from the firm itself. *See* PSR ¶ 106.

Crosby's testimony will establish that, had the firm uncovered Murdaugh's thefts sooner, it would have immediately terminated him. Indeed, after uncovering Murdaugh's thefts in September 2021, Murdaugh's partners immediately confronted him and he resigned from the law firm, terminating his employment agreement. The law firm thereafter issued a statement notifying the public that Murdaugh violated the law firm's standards and policies. Murdaugh did not receive any distributions that year, and the law firm spent millions repaying Murdaugh's victims and defending lawsuits related to his conduct.

Murdaugh's claim is essentially that he should not be held accountable for the whole sum he stole from the firm because—if he hadn't stolen from the firm—he would have been able to keep 92.5% of the money. This counterfactual need not be entertained. Murdaugh *did* steal from the firm. By doing so, he breached his Employment Agreement. And it strains reason to suggest that the firm would have pretended he didn't and paid him anyway. The loss amount should not be reduced.

---

energy, skill, loyalty, and best efforts to his duties . . . in a manner that will faithfully and diligently further the business and best interests of [the law firm] and will at all times adhere to the Rules of Professional Conduct and all policies and procedures of [the law firm]." *Id.* The law firm had the right to terminate Murdaugh if he breached or defaulted in the fulfillment of any material provision of the agreement, was disbarred from the practice of law, or performed an intentional act that could be reasonably expected to damage the reputation or assets of the law firm. *Id.* at 2.

### B. Criminal History Score

The PSR correctly assigns Murdaugh three criminal history points for a state tax-evasion conviction. PSR ¶ 125. Contrary to Murdaugh's claim, his state tax crime is not relevant conduct. It was distinct criminal conduct with different elements and different victims charged by a different sovereign. Murdaugh's objection should be overruled.

Under U.S.S.G. § 4A1.1(a), three criminal history points are added "for each prior sentence of imprisonment exceeding one year." A "prior sentence" is "any sentence previously imposed" for "conduct *not* part of the instant offense." U.S.S.G. § 4A1.2(a)(1) (emphasis added). A prior conviction *is* part of the instant offense if the conduct would be considered relevant conduct under § 1B1.3. U.S.S.G. § 4A1.2. So Murdaugh's state tax conviction is only point-countable if it is not relevant conduct. It is not relevant conduct, and the points were properly assigned.

The critical inquiry in determining whether a prior conviction is relevant conduct is whether the prior conduct is a "severable, distinct offense" from the offense of conviction. *See United States v. Dion Thomas*, 760 F.3d 879, 891 (8th Cir. 2014); *United States v. James Thomas*, 973 F.2d 1152, 1158 (5th Cir. 1992); *United States v. Blumberg*, 961 F.2d 787, 792 (8th Cir. 1992); *United States v. Beddow*, 957 F.2d 1330, 1338 (6th Cir. 1992). To make that finding, courts consider temporal and geographic proximity, whether the offenses had common victims, whether the prior conviction is used to prove the instant offense, whether there is continuity between the two offenses, and whether the same sovereign prosecuted the prior conviction. *See United States v. Smith*, 944 F.3d 1013, 1016 (8th Cir. 2019); *Dion Thomas*, 760 F.3d at 891 (citing *United States v. Pepper*, 747 F.3d 520, 526 (8th Cir. 2014)).

A recent Eighth Circuit opinion is instructive. *See United States v. Smith*, 944 F.3d 1013, 1016 (8th Cir. 2019). In *Smith*, the defendant argued his prior tax conviction was not point-

7

countable because it was relevant conduct to his wire-fraud conviction. *Id.* The Eighth Circuit disagreed. *Id.* "Although the two convictions share[d] the same time period, they differ[ed] significantly in relation to other important considerations." *Id.* at 1016–17. The two offenses did not share the same victims, scheme, or indictment; the tax conviction was not used to prove the wire-fraud conviction; and the record reflected no nexus between the former and latter convictions. *Id.* The prior conviction was therefore not relevant conduct.

Like in *Smith*, Murdaugh's state tax crime was a "severable, distinct offense" from his federal crimes. The state and federal convictions resulted from separate charging documents filed at different times by separate sovereigns. *See id.* at 1017. The victims of Murdaugh's federal crimes were individual clients and the law firm, while the victim of his state tax crime was the State of South Carolina. Murdaugh's evasion of state taxes was not used to establish his guilt on any of the federal offenses. And although the state tax offense was committed in the middle of Murdaugh's decades of federal financial crimes, "a defendant is not entitled to merge all criminal activities simply because these activities occurred over a single span of time, or out of a common base of operations." *United States v. Torres-Diaz*, 60 F.3d 445, 448 (8th Cir. 1995). Murdaugh's state tax crime is not relevant conduct.

Murdaugh argues that it is relevant conduct, because his federal fraud and state tax crimes are "offenses of a character for which § 3D1.2(d) would require grouping of multiple counts." *Def.'s Obj.* Under the relevant conduct guideline, for "offenses of a character for which § 3D1.2(d) would require grouping of multiple counts," relevant conduct includes acts and omissions "that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2). Murdaugh argues his *state* tax crime would be "properly grouped" with his *federal* fraud offenses under § 3D1.2(d) because they were all "part of a single continuous

8

course of criminal activity involving the same proceeds obtained through the fraud offense conduct." *Def.'s Obj.* His claim is without merit.

There is simply no avenue to group Murdaugh's state crime with his federal offenses. The grouping rules "apply to multiple counts of conviction (A) contained in the same indictment or information; or (B) contained in different indictments or informations for which sentences are to be imposed at the same time or in a consolidated proceeding." U.S.S.G. Chap. 3, Part D, Introductory Commentary. Murdaugh's sentencing presents neither situation. His state tax and federal fraud crimes were not charged or sentenced together, and they cannot be grouped.[6]

The cases Murdaugh relies on are inapposite—neither involves a relevant conduct analysis anything like the one here. He cites a Second Circuit case holding *federal* tax evasion and mail fraud offenses are properly grouped under § 3D1.2(d) because both "follow offense level schedules that trigger substantially identical offense level increments based on the amount of loss." *Id.* (citing *United States v. Petrillo*, 237 F.3d 119, 125 (2d Cir. 2000)). Because this Court is not sentencing Murdaugh for his state crime, that crime has no offense level schedule to follow. There is thus no need to harmonize an offense level for the state crime with the offense level for the federal crimes. *Petrillo*'s analysis is irrelevant.

---

[6] Even if state and federal offenses could somehow be grouped, Murdaugh's assertion that his tax crime would be grouped with his fraud crimes because the state crime doesn't involve "significant additional criminal conduct," *Def.'s Obj.*, is far from clearly established. The Third, Fourth, Sixth, and Tenth Circuits have all held federal tax evasion should not be grouped with mail fraud, wire fraud, or money laundering counts. *See Weinberger v. United States*, 268 F.3d 346, 354–55 (6th Cir. 2001) (rejecting grouping of tax evasion and mail fraud counts); *United States v. Morris*, 229 F.3d 1145, 2000 WL 1260162 (4th Cir. 2000) (Table) (no error in refusing to group money laundering and tax evasion counts); *United States v. Vitale*, 159 F.3d 810, 813–15 (3d Cir. 1998) (declining to group wire fraud and tax evasion); *United States v. Peterson*, 312 F.3d 1300, 1303 (10th Cir. 2002) (declining to group mail fraud and tax evasion, recognizing two offenses involve different to distinct victims "because society is harmed by tax evasion, whereas an individual is harmed by mail fraud").

9

Murdaugh also cites a Fifth Circuit case holding *federal* tax evasion and mail fraud counts should have been grouped under § 3D1.2(c) because the fraud offense enhanced the offense level for the tax offense.[7] *Id.* (citing *United States v. Haltom*, 113 F.3d 43, 46 (4th Cir. 1997)). The offenses had to be grouped "to avoid punishing [the defendant] twice for mail fraud." *Haltom*, 113 F.3d at 47. Murdaugh's state crime has not been factored into his Guidelines calculation at all. So he does not need grouping to avoid double-counting of the conviction; he needs grouping to avoid having it counted at all. *Haltom* is unhelpful to him. His state and federal offenses cannot be grouped.

From there, the rest of Murdaugh's relevant conduct argument unravels. The offenses cannot be grouped under § 3D1.2(d), so the definition of relevant conduct he relies on from § 1B1.3(a)(2)—which encompasses acts or omissions "that were part of the same course of conduct or common scheme or plan as the offense of conviction"—does not apply. And the key question for the Court is not, as Murdaugh asserts, whether the fraud and tax offenses were "part of the same course of conduct." *See Def.'s Obj.* As set forth above, the determinative legal issue is instead whether the state tax crime and federal offenses are "severable, distinct" crimes. They are, and Murdaugh's objection should be overruled.

One final point bears mentioning. Murdaugh's scheme to defraud South Carolina by willfully failing to pay state taxes has not been accounted for in any aspect of the Offense Conduct portion of the PSR or the Offense Level Computation. Instead, it was appropriately taken into account as part of his criminal history. And criminal history is, of course, "directly relevant" to the

---

[7] Notably, Murdaugh's relevant conduct argument under § 1B1.3(a)(3) hinges on the Court finding his state crime would be grouped with his federal crimes under § 3D1.2(d), not § 3D1.2(c). *See* § 1B1.3(a)(3) (applying "solely with respect to offenses of a character for which § 3D1.2(d) would require grouping"). *Haltom* is therefore irrelevant.

10

purposes of sentencing. U.S.S.G. Chap. 4, Part A, Introductory Commentary. "General deterrence of criminal conduct dictates that a clear message be sent to society that repeated criminal behavior will aggravate the need for punishment with each recurrence." *Id.* The Guidelines require courts to consider criminal history "[t]o protect the public from further crimes of the particular defendant" and reduce "the likelihood of recidivism and future criminal behavior." *Id.* Construing Murdaugh's state tax crime to be relevant conduct—making it non-point-countable—would essentially "wash away" that crime from his federal sentencing. PSR Addendum at 8 (quoting *United States v. Vitale*, 159 F.3d 810 (3d Cir. 1998)). Unlike true relevant conduct, it wouldn't be factored into his Offense Level Computation *or* his criminal history score. Murdaugh should not be given the windfall that would result from escaping accountability for his state crime in his federal sentencing.

### III. Sentencing Factors

Title 18 U.S.C. § 3553(a) sets forth the sentencing factors that a court must consider in fashioning a sentence that is sufficient but not greater than necessary to serve the purposes of sentencing. Those factors include the nature and circumstances of the offense, the history and characteristics of the defendant, and the needs for the sentence to promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public from future crimes of the defendant.

#### a. Nature and Circumstances of the Offense

Murdaugh spent more than fifteen years spinning a complex web of exploitation, manipulation, and deceit—preying on highly vulnerable victims in pursuit of his own personal gain. Beginning in at least September 2005 and continuing until September 2021, Murdaugh devised and executed a scheme to defraud and to obtain money owed to his clients and his law

firm. Murdaugh's scheme evolved over the years to avoid detection and capitalize on every opportunity to increase his cash flow. PSR ¶¶ 71–106. He:

- Drafted, and directed law firm employees to draft, disbursement sheets diverting settlement funds to his personal bank accounts;

- Claimed funds that were held in the law firm's trust account to satisfy liens on clients' settlement funds as attorney's fees and then directed the disbursement of those funds for his personal benefit;

- Claimed and collected attorney's fees on fake or nonexistent annuities;

- Created fraudulent "expenses" that were never incurred on client matters and directed the disbursement of settlement funds to pay the cited costs, including claimed medical expenses, construction expenses, and airline expenses;

- Directed other associated attorneys to disburse attorney's fees directly to him; and

- Intercepted insurance proceeds intended for beneficiaries and deposited them directly into his personal account.

PSR ¶¶ 27–29.

Murdaugh owned and controlled bank accounts intentionally disguised as accounts for Forge Consulting. PSR ¶¶ 31–36. He used these accounts to hide the source and destination of his ill-gotten gains and to funnel millions in stolen money into his pockets. Then he laundered the money through cash transactions, transferring funds to other personal bank accounts, making credit card payments, and issuing checks to other people. PSR ¶ 105.

But Murdaugh did not act alone. He enlisted others to facilitate, further, and conceal his crimes, exploiting his position in the community, the power of his law firm, and his personal relationships—all to enrich himself and his friends. Beginning in 2011, Murdaugh recruited Russell Laffitte, a personal friend and banker, to serve as a fiduciary for some of Murdaugh's most vulnerable clients: Hannah and Alania Plyler, Natasha Thomas, Hakeem Pinckney, and Arthur Badger. Together, they stole $2,094,826.54 in fees and settlement proceeds from Thomas,

Pinckney, and Badger. And they extended themselves more than $1 million in loans from the conservatorship Laffitte was charged with managing for Hannah Plyler. PSR ¶¶ 71–73.

Thomas was a young girl recovering from severe injuries sustained in a car accident. Pinckney had passed away after being rendered a quadriplegic in the same accident. Badger was left to raise six young children after burying his wife. PSR ¶¶ 74–80. Murdaugh's victims trusted him to vindicate their interests and right their wrongs—not to subject them to additional suffering and harm.

Murdaugh's scheme with Laffitte was just one piece of the puzzle. Murdaugh and his close friend and fellow attorney Cory Fleming victimized other vulnerable clients. PSR ¶¶ 82–95. Ms. Pamela Pinckney, Hakeem's mother, suffered severe injuries in the car accident that rendered her son a quadriplegic. She relied on and trusted Murdaugh and Fleming while she cared for her son, who later died from complications related to the accident. PSR ¶¶ 82–83. From 2012 to 2017, Murdaugh and Fleming diverted Ms. Pinckney's settlement funds to enrich themselves, including by chartering flights to the College Baseball World Series. *Id.*

In 2018, Murdaugh and Fleming conspired again to steal from vulnerable victims: the children of Murdaugh's housekeeper. PSR ¶ 84. Gloria Satterfield fell at Murdaugh's home and died a few weeks thereafter. PSR ¶ 84. Murdaugh convinced Fleming to represent Satterfield's sons and sue Murdaugh to recover on his homeowner's insurance policy. *Id.* But rather than uphold his duties to her sons, Fleming assisted Murdaugh by diverting more than $250,000 in settlement funds for Fleming and Murdaugh's personal gain. PSR ¶¶ 84–95. Together, they lied to Satterfield's sons, the court, opposing counsel, and the insurance company, and they falsified settlement documents. *Id.* Ironically, Murdaugh also lied to Fleming by hiding the full scope of

13

the scheme. Murdaugh stole more than $4.3 million from Satterfield's sons, who never received a penny following their mother's death. *Id.*

The Government's investigation revealed that Murdaugh victimized more than 25 individuals and their families and loved ones—in addition to his thefts from his law partners and family members. PSR ¶¶ 104, 106. Many of Murdaugh's victims have been publicly identified in court proceedings. But the Government has talked to Murdaugh's many other victims, most of whom are understandably reticent to relive their most difficult moments and do not wish to be publicly identified.

To highlight the breadth, scope, and severity of Murdaugh's scheme beyond his thefts from Thomas, Pinckney, Badger, and the Satterfields, and to give a voice to the additional victims, the Government briefly summarizes the loss sustained by the remaining victims:

a. <u>LB</u>: In September 2005, Murdaugh obtained a $750,352.74 recovery on behalf of his client. He filed an undated false disbursement sheet in the Allendale Court of Common Pleas and diverted a total of $292,179.17 in settlement proceeds meant for the client to his own personal use. He also withheld an additional $2,030.89 in overcharged attorney fees.

b. <u>HH</u>: Murdaugh obtained a $1,004,542.32 total recovery on behalf of his client. In November 2008, he filed a false disbursement sheet in the Colleton County Court of Common Pleas and diverted $50,000.00 in settlement proceeds meant for the client to his own personal use.

c. <u>BJ</u>: Murdaugh obtained a $350,000.00 recovery on behalf of his client and withheld $35,000.00 for payment of a medical lien. Unbeknownst to the client, Murdaugh negotiated the lien down to $18,971.42. And in December 2009, Murdaugh diverted the remaining $15,893.58 to overcharged attorney fees.

d. <u>GS as PR</u>: Murdaugh obtained a $500,000.00 recovery on behalf of his client, consisting of $333,333.34 meant for the client and $166,666.66 meant for PMPED legal fees and advanced costs. In March 2010, Murdaugh filed a false disbursement sheet in the Hampton County Court of Common Pleas purporting a $900,000.00 recovery with $300,000.00 in associated legal fees—overstating the fees he was owed by $133,333.34. Then he diverted an additional $36,000.00 of settlement proceeds to his personal use.

e. <u>YF</u>: Murdaugh obtained a $55,000.00 recovery on behalf of his client. He filed an undated false disbursement sheet in the Colleton County Court of Common Pleas which instead reflected a recovery of only $25,000.00. Between September and December 2010, Murdaugh

14

    diverted the remaining $30,000.00 of settlement proceeds meant for the client to his personal use.

f. <u>CC as PR</u>: Murdaugh obtained a $585,000.00 recovery on behalf of his client. In December 2010, he filed a false disbursement sheet in the Hampton County Court of Common Pleas and diverted $20,000.00 of settlement proceeds meant for the client to his personal use. He also illegally diverted an additional $8,400.00 to a friend.

g. <u>JV</u>: Murdaugh and Wilson obtained a $500,000.00 recovery on behalf of their client. As in the Faris case, in December 2014, Wilson wrote a check for $100,000.00 in legal fees meant for PMPED directly to Murdaugh. That allowed Murdaugh to divert the legal fees to his personal use.

h. <u>ER</u>: Murdaugh and Wilson obtained a $1,098,326.83 recovery on behalf of their client. In January 2015, Murdaugh withheld $7,500.00 from the settlement proceeds for a false payment to Medical Resources for an expert retainer fee.

i. <u>DM</u>: Murdaugh obtained a $1,700,000.00 total recovery on behalf of the client. In August 2015, he falsely represented on a disbursement sheet filed in the Allendale County Court of Common Pleas that $2,000,000.00 was recovered, $500,00.00 of which would be sent to Forge Consulting for a structured annuity. None of the $1,700,000.00 was ever sent to Forge Consulting.

    After using the recovery to pay legal fees, advanced costs, liens, and medical bills, Murdaugh diverted a total of $383,056.14 of the client's settlement funds to his personal use. He also made fraudulent payments of $17,500.00 purportedly for a doctor and $7,500.00 to Medical Resources. And he withheld an additional $200,000.00 in overcharged attorney fees.

j. <u>JB</u>: Murdaugh obtained a $1,200,000.00 recovery on behalf of his client. In December 2015, he filed a false disbursement sheet in the Hampton County Court of Common Pleas and diverted $95,000.00 of settlement proceeds meant for the client to his personal use. An additional $7,500.00 in advanced costs collected for purported payments made to a medical provider were fraudulent.

k. <u>RD</u>: Murdaugh obtained a $65,000.00 recovery on behalf of his client. In August 2016, he filed a false disbursement sheet in the Hampton County Court of Common Pleas and diverted $9,569.30 of settlement proceeds meant for the client to his personal use.

l. <u>JR</u>: Murdaugh obtained a $1,225,258.10 recovery on behalf of his client. Between August 2016 and November 2019, he filed false disbursement sheets in the Hampton County Court of Common Pleas and diverted a total of $95,541.17 of settlement proceeds meant for the client to his personal use.

m. <u>JJ</u>: Murdaugh obtained a $812,500.00 recovery on behalf of his client. Between August and September 2018, he filed false disbursement sheets in the Beaufort County Court of Common Pleas and diverted a total of $150,000.00 of settlement proceeds meant for the client to his personal use.

n. <u>MD</u>: Murdaugh obtained a $250,000.00 recovery on behalf of his client. In October 2018, he filed a false disbursement sheet in the Hampton County Court of Common Pleas and diverted $19,500.00 of settlement proceeds meant for the client to his personal use.

o. <u>AH</u>: Murdaugh obtained a $897,500.00 total recovery on behalf of the client. In December 2018, he filed a false disbursement sheet in the Allendale Court of Common Pleas and diverted $148,073.46 of settlement proceeds meant for the client and $77,000.00 of legal fees meant for PMPED to his personal use.

p. <u>BB</u>: Murdaugh obtained a $355,693.00 total recovery on behalf of the client. In February 2019, he filed false disbursement sheets and diverted the entire settlement—$354,334.48 of client settlement funds and $1,358.52 of PMPED legal fees—to his personal use.

q. <u>AG as PR</u>: Murdaugh obtained a $2,225,000.00 recovery on behalf of the client. On April 9, 2019, Murdaugh filed a false disbursement sheet in the Hampton County Court of Common Pleas and diverted $112,500.00 of settlement proceeds meant for the client to his personal use.

r. <u>CA</u>: Murdaugh obtained a $1,745,606.00 total recovery on behalf of his client. In February 2020, he filed a false disbursement sheet in the Hampton County Court of Common Pleas and diverted $450,000.00 of settlement proceeds meant for the client and $300,000.00 legal fees meant for PMPED to his personal use.

s. <u>EM as PR</u>: Murdaugh obtained a $183,528.00 recovery on behalf of his client, consisting of $136,740.20 meant for the client and $46,787.80 meant for PMPED legal fees and advanced costs. In December 2020, he filed a false disbursement sheet in the Hampton County Court of Common Pleas and diverted $152,866.00 of settlement funds to his personal use. The remaining balance was disbursed for attorney fees, leaving the client with none of the settlement proceeds.

t. <u>TM</u>: Murdaugh obtained a $125,000.00 recovery on behalf of his client consisting of $75,000.00 meant for the client and $50,000.00 meant for PMPED legal fees. In January 2021, Murdaugh filed an undated false disbursement sheet in the Orangeburg County Court of Common Pleas which falsely reflected $125,000.00 was disbursed to "Forge." Murdaugh instead diverted the entire settlement for his personal use.

u. <u>BK as PR</u>: Murdaugh obtained a $633,168.96 recovery on behalf of his client. Between December 2020 and May 2021, he filed false disbursement sheets in the Colleton County Court of Common Pleas and diverted a total of $60,411.66 of settlement proceeds meant for the client and $114,789.17 of legal fees meant for PMPED to his own personal use.

In his sentencing memorandum, Murdaugh minimizes the loss sustained by the victims, arguing that he should receive some benefit because the victims have been made financially whole. Dkt. 69, at 13. He even goes so far as to claim that, in light of their financial recoveries, the victims are better off now than they would have been had he not stolen from them. *Id.* Murdaugh has never

16

made his victims whole, financially or otherwise, nor has he made any efforts to do so. This Court should not give him the benefit of others bearing the financial fallout of his crimes. The severity of the nature and circumstances of his crimes cannot be overstated.

### b. History and Characteristics of the Defendant

Murdaugh appeared to live an upstanding life, both personally and professionally. But in reality, he spent most of his career deceiving everyone in his personal and professional circles—unburdened by his own conscience. The scope and pervasiveness of Murdaugh's deceit is staggering. He ranks as one of the most prolific fraudsters this state has ever seen. When the house of cards began to fall, Murdaugh murdered his wife and son.

Facing the mountain of evidence against him, Murdaugh pleaded guilty to all of the conduct outlined above and agreed to fully cooperate with the Government and FBI. Dkt. 37. Murdaugh has taken responsibility for his own conduct and admitted the roles that Cory Fleming and Russell Laffitte played in his schemes. But more than $6 million in stolen settlement proceeds remains unaccounted for.

### c. Need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public.

Murdaugh is currently serving two consecutive life sentences for the murders of his wife and son. PSR ¶ 126. He has also been convicted of and sentenced for state offenses related to his schemes to defraud his clients, law firm, and others. PSR ¶¶ 118–125. Murdaugh was sentenced to 5-, 10-, and 20-year concurrent terms and one consecutive 7-year term for those financial crimes. *See* Exhibit 1, Murdaugh SCDC Conviction Summary; PSR ¶¶ 120–126. According to the South Carolina Department of Correction's office of general counsel, Murdaugh's projected "max-out"

17

date on the concurrent sentences is July 9, 2039. Exhibit 1. His projected "max-out" date on the consecutive sentence is June 18, 2045. Exhibit 1.

Although Murdaugh has been sentenced in state court for financial crimes related to his schemes to defraud, he has not yet been held accountable for the full scope of his thefts. Importantly, Murdaugh was not convicted of or sentenced in state court for any conduct related to 11 victims outlined above: LB, HH, BJ, GS as PR, YF, CC as PR, JV, ER, MD, AH, and BB. *See* PSR ¶¶ 120–126. The loss associated with those victims alone is nearly $1.3 million. *See* PSR ¶ 106. If Murdaugh were to be sentenced solely on that conduct, his applicable guideline range would be 110-137 months.[8]

For decades, Murdaugh went to unimaginable lengths—deceiving, defrauding, and stealing—to enrich himself. His victims, his family, and his former law partners have suffered consequences that will follow them for the rest of their lives. His crimes have sowed seeds of distrust in the legal profession, the judiciary, and the banking system in South Carolina and across the nation. The fact that those crimes were conducted under the auspices of a law license is disgraceful. His sentence must reflect the seriousness of his conduct and provide just punishment for it. It must promote the public respect for the law that Murdaugh has so seriously undermined. And it must provide adequate deterrence and protect the public from those, like Murdaugh, who would abuse their positions of trust for their own gain.

[SIGNATURE PAGE TO FOLLOW]

---

[8] Base Offense Level 7 (§ 2B1.1(a)(1)(B)) + 14 (§ 2B1.1(b)(1) more than $550,000 but less than $1.5 million) + 2 (§ 2B1.1(b)(2)(A)(i) 10 or more victims) + 2 (§ 2B1.1(b)(10)(C) sophisticated means) + 2 (§ 3A1.1(b)(1) vulnerable victim) + 2 (§ 3B1.3 position of trust) + 2 (§ 3B1.1(c) organizer/leader) = 31 − 3 (acceptance) → Total Offense Level 28. With Criminal History Category IV, Murdaugh's applicable guideline range would be 110-137 months.

Respectfully submitted,

ADAIR F. BOROUGHS
UNITED STATES ATTORNEY

By: s/ *Emily Evans Limehouse*
Emily Evans Limehouse (Federal ID #12300)
Kathleen Michelle Stoughton (Federal ID #12161)
Winston D. Holliday, Jr. (Federal ID #7597)
Assistant United States Attorneys
151 Meeting Street, Suite 200
Charleston, South Carolina, 29402
(843) 266-1663
Emily.Limehouse@usdoj.gov

March 28, 2024